[No. B023155. Second Dist., Div. Three. May 31, 1988.]

MICHAEL J. et al., Plaintiffs and Appellants, v.
LOS ANGELES COUNTY DEPARTMENT OF ADOPTIONS,
Defendants and Respondents.

860

**COUNSEL**

Sheldon Rosenfield for Plaintiffs and Appellants.

Collins, Collins, Muir & Traver and John J. Collins for Defendant and Respondent.

OPINION

ARABIAN, J.—

## INTRODUCTION

This appeal concerns an action by an adoptive parent and an adoptee against the County of Los Angeles, Department of Adoptions (the County) for negligence and fraud. Plaintiffs Michael J., a minor, and Mary T., the adoptive parent (appellants) allege that prior to placement, the County failed to determine the medical condition of the adoptee and made misrepresentations of complete health. Some 10 years after his adoption, Michael had seizures and was diagnosed as suffering from Sturge-Weber Syndrome, a congenital degenerative nerve disorder. Appellants sought damages for emotional distress and medical expenses. The County moved for summary judgment on the grounds of immunity from liability pursuant to Government Code sections 818.8 and 822.2[1] and that public policy considerations militate against recognition of such a cause of action. Appellants appeal the trial court's grant of summary judgment. We reverse.

## STATEMENT OF THE FACTS

Michael was born on March 30, 1970, at Memorial Hospital in Long Beach, California. On March 31, 1970, Michael's natural mother voluntarily relinquished him to the County for adoption.

Appellants' complaint for negligence, fraud and personal injury set forth the following allegations of fact: Since birth, Michael had a port wine stain on his upper torso and face. Based upon medical knowledge and information available in 1970, the County knew or in the exercise of reasonable care should have known that this was a manifestation of Sturge-Weber

---

[1] All future statutory references are to the Government Code unless otherwise indicated.

Section 818.8 provides: "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

Section 822.2 provides: "A public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice."

Syndrome. The County concealed this fact from Mary T., who had inquired about the stain, at a time when she was considering adopting Michael. Mary, who did not have the ability to make such a determination herself, would not have adopted Michael if she had known that the stain was a manifestation or symptom of this disorder. Mary adopted Michael in May 1970 and did not learn that Michael had Sturge-Weber Syndrome until he suffered an epileptic seizure on July 28, 1981. He had not received any treatment for this condition until that time. Mary has suffered emotional distress, has incurred medical expenses and anticipates additional medical expenses.

The County filed a motion for summary judgment and submitted the declarations of counsel and the custodian of the adoption file, setting forth the following information: On the Newborn History Form, completed by Dr. Tarre of the hospital, a special note was made of a " 'large port wine stain on face and portions of chest.' " The County classified Michael as " 'hard to place.' " He was placed in a foster home on April 3, 1970, and it was observed that "the birthmark" appeared on the whole head and face and portion of the back and chest. The records of County of that date state: "Medically this has been described as a 'port wine stain' which will probably not fade as the baby grows older. *However, doctor will not make a definite statement as to the prognosis for this child.*" (Italics added.)

The County related that Mary saw Michael on the Ben Hunter TV show on May 14, 1970. The purpose of Michael's display was to recruit parents willing to adopt the child despite the extensive birthmarks. "On May 22, 1970, Michael [J.] was medically examined and determined to be suitable for adoption, being in good health, except for the port wine stain, a deep sunburn color. At that time defendant had no knowledge of whether or not Michael [J.] had Sturge-Weber Syndrome." The County's case record of June 3, 1970, states, "Although the baby has a very distinct birthmark all over parts of his body, this did not bother the [adoptive parents]. They thought he was a beautiful baby." Between June 12, 1970, and March 5, 1971, Michael was seen 16 times by Mary's pediatrician, Dr. Mittleman. The last medical report (prior to adoption) states, "The patient [*sic*] general health at his last visit was good physical condition."

Appellants opposed the County's motion for summary judgment. Mary declared that she was not aware that a doctor who examined Michael would not make a definite statement regarding his prognosis and that she took Michael to Dr. Mittleman for shots and temporary problems, such as infections. Steven Myles Portman, M.D., board certified in neurology with special qualifications in child neurology by the American Board of

Psychiatry and Neurology, Inc., declared that it was his professional opinion that the medical examination performed on Michael after his birth which was signed by Dr. Tarre should have contained a diagnosis of Sturge-Weber Syndrome with a prognosis for epilepsy. He stated that the syndrome is congenital and present at birth and is described in medical literature.

The trial court granted the County's motion for summary judgment on the basis of immunity, stating in the minute order that there were no triable issues of material fact, and "[f]urther, summary judgment is granted based on moving papers and case of *Richard P.* v. *Vista Del Mar,* 106 CA3 860."

## ISSUES

1.  Does section 818.8 immunize the County from liability for negligent or intentional misrepresentation or concealment regarding the medical health of a prospective adoptee?

2.  Do public policy considerations require that an adoption agency be immune from liability for negligent or intentional misrepresentation or fraudulent concealment regarding the health of a prospective adoptee?

## DISCUSSION

1.  *The standard of review.*

A motion for summary judgment must be granted if the papers properly submitted by the parties show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

"The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. (*Eagle Oil & Ref. Co.* v. *Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264].) Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. (Code Civ. Proc., § 437c; *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].)" (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].)

In considering the motion, the court is required to consider all the evidence set forth in the papers, except where objections are properly sustained, and all inferences reasonably deducible from such evidence. If a

contradiction in the evidence or inferences raises a triable issue of any material fact, summary judgment cannot be granted. (Code Civ. Proc., § 437c, subd. (c).) " 'The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.' (*Lipson* v. *Superior Court, supra,* 31 Cal.3d at p. 374.) ■ 'The affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion.' (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 436-439 [ ].) '. . . [I]ssue finding rather than issue determination is the pivot upon which the summary judgment law turns.' (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [ ].)" (*Mann* v. *Cracchiolo, supra,* 38 Cal.3d at pp. 35-36.) "[H]owever, . . . the rule of liberal construction does not go so far as to permit of a counteraffidavit which merely repeats the allegations of the pleadings or which contains no evidentiary facts at all." (*Saporta* v. *Barbageleta* (1963) 220 Cal.App.2d 463, 469 [33 Cal.Rptr. 661].)

■ When defendant's declaration in support of a motion for summary judgment establishes a complete defense to plaintiff's action or demonstrates an absence of an essential element of plaintiff's case, the motion for summary judgment must be granted unless the plaintiff's evidence shows that a triable issue of fact exists in regard to that defense or essential element. (*Stalnaker* v. *Boeing Co.* (1986) 186 Cal.App.3d 1291, 1297 [231 Cal.Rptr. 323].)

2. *Section 818.8 does not immunize the County from liability for negligent or intentional misrepresentations or concealment in regard to the health of a prospective adoptee.*

In 1963, the Legislature adopted several interrelated statutory provisions concerning governmental liabilities and immunities which have become known as the Tort Claims Act (the Act). (Stats. 1963, ch. 1681, p. 3266; ch. 1715, p. 3369; ch. 1682, p. 3289; ch. 1683, p. 3296; ch. 1684, p. 3305; ch. 1805, p. 3647. See Van Alstyne, Cal. Government Tort Liability Practice (1980), § 2.1, p. 31.) Substantive liabilities and immunities of public entities and employees are treated principally in sections 810-895.8.

Under the Act, governmental tort liability must be based on statute; all common law or judicially declared forms of tort liability, except as may be required by state or federal Constitution, were abolished. (§ 815.) Section 815.2, subdivision (a), imposes vicarious liability upon public entities for the tortious acts and omissions of their employees. In the absense of a statute a

public entity cannot be held liable for an employee's act or omission where the employee himself would be immune. (§ 815.2, subd. (b).)[2] Nothing in these provisions affected governmental liability based on contract or the right to obtain relief other than money or damages. (§ 814.)

■ The policy underlying the Act is that liability is the rule, immunity the exception. (*Baldwin* v. *State of California* (1972) 6 Cal.3d 424, 435 [99 Cal.Rptr. 145, 491 P.2d 1121]. "Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail." (*Ramos* v. *Madera* (1971) 4 Cal.3d 685, 692 [94 Cal.Rptr. 421, 484 P.2d 93].)

■ The Act provides governmental entities and employees immunity from liability for "misrepresentations." (§§ 818.8 and 822.2.) The immunity provisions state that the immunity includes both "negligent" and "intentional" misrepresentations except that the public employee is not immune if "he is guilty of actual fraud, corruption or actual malice." (§ 822.2) (See *ante*, fn. 1.) The Government Code does not define "misrepresentation." California law recognizes several categories of fraud and deceit, including negligent and intentional misrepresentation. (Civ. Code, §§ 1572, 1710.)[3] The courts have assumed that the immunity includes all types of fraud and deceit cases including fraudulent concealment. (See, e.g., *Warner Constr.*

---

[2] The Legislative Committee Comment to section 815.2 states: ". . . [¶] Under this section, it will not be necessary in every case to identify the particular employee upon whose act the liability of the public entity is to be predicated. All that will be necessary will be to show that some employee of the public entity tortiously inflicted the injury in the scope of his employment under circumstances where he would be personally liable. . . ."

[3] Civil Code section 1572 provides: "Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

"2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

"3. The suppression of that which is true, by one having knowledge or belief of the fact;

"4. A promise made without any intention of performing it; or,

"5. Any other fact fitted to deceive."

Civil Code section 1710 provides: "A deceit, within the meaning of the last section is, either:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

"2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

"3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

"4. A promise, made without any intention of performing it."

*Corp.* v. *Los Angeles* (1970) 2 Cal.3d 285, 293 [85 Cal.Rptr. 444, 466 P.2d 996]; *Harshbarger* v. *City of Colton* (1988) 197 Cal.App.3d 1335, 1345 [243 Cal.Rptr. 463]; *Page* v. *City of Montebello* (1980) 112 Cal.App.3d 658, 670-671 [169 Cal.Rptr. 447]; *Schonfeld* v. *City of Vallejo* (1975) 50 Cal.App.3d 401 [123 Cal.Rptr. 669].)[4]

Contrary to the County's contention that the immunity provided by these sections is "absolute"[5] and covers the misrepresentations and concealment of information alleged by appellants, the scope of the immunity for misrepresentation is limited. As the California Supreme Court stated in *Johnson* v. *State* (1968) 69 Cal.2d 782, 800 [73 Cal.Rptr. 240, 447 P.2d 352], the Legislature employed the term "misrepresentation" in a narrow, rather than expansive sense: " '[M]isrepresentation,' as a tort distinct from the general milieu of negligent and intentional wrongs, applies to interferences with financial or commercial interest. The Legislature designed section 818.8 to exempt the governmental entity from this type of liability."[6]

Justice Matthew Tobriner, writing for the court, explained this interpretation, by centering on the Legislature's goal in exempting the state from tort liability for "misrepresentation":

"The Legislature, in creating this exemption, must have had in mind those areas in which private defendants typically face liability for 'misrepresentation'; in other areas, immunity for 'misrepresentation' would be superfluous.

"Considering a tort claim under the analogous section of the Federal Tort Claims Act, the United States Supreme Court stated, citing Dean

[4] It has been suggested that sections 818.8 and 822.2 may not include the other two types of fraud and deceit actions since they are characterized not by affirmative false representations but by concealment: suppression of truthful facts by someone having knowledge of them and a duty to disclose them (Civ. Code, § 1710, subd. 3) and making a promise without any intention of performing it. (Civ. Code, § 1710, subd. 4.) (Van Alstyne, *supra,* at pp. 170-171.)

[5] The issue is not whether the immunity is "absolute" but the *scope* of the granted immunity. Where the immunity applies, it is absolute in that it is a complete bar to liability for an "injury," defined as "death, injury to a person, damage to or loss of property, or any other injury that a person may suffer to his person, reputation, character, feelings or estate, of such nature that it would be actionable if inflicted by a private person." (§ 810.8.)

The question of the scope of the immunity is a matter of law. County's contention that it was within the trial court's discretion to determine whether this action fits within the limits set out in *Johnson,* and that the trial court did not abuse that discretion is meritless.

[6] Section 814 provides that nothing in the Act "affects liability based on contract." Thus, a plaintiff may be barred by section 818.8 from bringing an action for fraudulent concealment or misrepresentation which interferes with a financial or commercial interest but still be able to maintain a contract action. See, e.g., *Warner Constr. Corp.* v. *Los Angeles* (1970) 2 Cal.3d 285, 293-294 [85 Cal.Rptr. 444, 466 P.2d 996].

Prosser: 'many familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings." ' (*United States* v. *Neustadt* (1961) 366 U.S. 696, 711, fn. 26 [].) The Senate Committee on Judiciary Comment to section 818.8 of California's statute confirms this interpretation by giving the following example: 'This section will provide . . . a public entity with protection against possible tort liability where it is claimed that an employee negligently misrepresented that the public entity would waive the terms of a construction contract requiring approval before changes were made.' (Sen. Jour. (April 24, 1963) p. 1889.)" (*Ibid.*)

The *Johnson* case is similar to the one before us in that it concerns concealment of information about a child being placed in the plaintiffs' home. In *Johnson,* plaintiff sued the state for personal injuries resulting from an assault by a 16-year-old youth for whom she provided a foster home. The complaint alleged that the California Youth Authority "acted negligently in allowing 'a 16 year old boy with homicidal tendencies, and a background of violence and cruelty towards both animals and humans to be placed in the home' of Mr. and Mrs. Johnson without 'notice of any dangerous propensities' even though 'defendants . . . had notice of same.' " (*Id.,* at p. 785.) The court held that the state was not immune from liability pursuant to section 820.2, which provides for public employee immunity for discretionary acts, or pursuant to section 845.8, which provides immunity for a determination whether to parole or release a prisoner or of the terms and conditions of a parole or release, and therefore the court erred in granting the state summary judgment. In addition, the court explained that the trial court improperly sustained the state's earlier demurrer to plaintiff's first complaint on the ground of section 818.8 immunity. "The parole officer's conduct, whether he expressed affirmative and false representations as to the youth's character or merely remained silent on this matter, does not warrant immunity under Government Code section 818.8 as a 'misrepresentation.' " (*Id.,* at p. 799.)

Subsequent decisions of the Court of Appeal are consistent with the Supreme Court's interpretation in *Johnson.*[7] Most recently, in *Bastian* v.

---

[7] County contends that the California Supreme Court's interpretation of legislative intent regarding misrepresentation immunity in *Johnson* was wrong and that its interpretation contradicts the statutory scheme of the Act. Under the doctrine of stare decisis, we accept the

*County of San Luis Obispo* (1988) 199 Cal.App.3d 520 [245 Cal.Rptr. 78], the court held that sections 818.8 and 822.2 did not immunize a deputy sheriff and the county from liability. There, a newspaper photographer brought an action for negligence and intentional misrepresentation after the deputy admitted that he had placed a vodka bottle next to a car accident victim's body before the photographer had photographed the scene. After the photograph's publication, the victim's survivors sued the newspaper and the photographer for staging the photograph. The deputy's admission occurred in the course of that suit. The court held that the trial court erred in sustaining the defendants' demurrers on the basis of immunity.[8]

In *Connelly* v. *State of California* (1970) 3 Cal.App.3d 744 [84 Cal.Rptr. 257], the court held that the state was not immune from liability for negligently providing the owner of a marina with inaccurate information as to the anticipated rise in the river during a period of heavy rains. After citing the Supreme Court's interpretation of "misrepresentation" in section 818.8 as articulated in *Johnson,* the court said, "Applying the foregoing criteria to the facts of this case, we find that although appellant suffered a commercial loss in the sense that his business installations were damaged, the loss did not result from a commercial transaction between him and the state, nor from the state's interference with his commercial transactions. The complaint alleges a service gratuitously performed by the state in a negligent manner, resulting in physical damage to property. As there is no allegation of a tortious interference by the state with appellant's commercial activities within the rationale of *Johnson,* we conclude that section 818.8 does not apply to this case." (*Id.,* at p. 752.)

Court of Appeal cases which have held that section 818.8 provided immunity concern interferences with financial or commercial interests, including the issuance of permits or licenses.

For example, in *Harshbarger* v. *City of Colton, supra,* 197 Cal.App.3d 1335, homeowners who had to reconstruct their home to bring it up to city code standards sued the city alleging city building inspectors, who periodically inspected the residence, intentionally misrepresented and suppressed the fact that the residence did not meet the various standards. The court held that the alleged interference with the Harshbargers' financial interest fell within the immunity provisions of section 818.8. (*Id.,* at p. 1342; accord,

court's interpretation. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

[8] The court, however, ruled that the demurrer to the cause of action for intentional fraud was properly sustained, even though on an incorrect ground, because it was uncertain and ambiguous and failed to state a cause of action. (*Id.,* at pp. 532-534.)

*Grenell* v. *City of Hermosa Beach* (1980) 103 Cal.App.3d 864, 874 [163 Cal.Rptr. 315].)

County argues that cases which have recently applied section 818.8 have not included express declarations that the actions involved financial or commercial interests and it is not clear that a court is required to make such a finding before applying section 818.8. Nevertheless, an examination of the facts of all of the cases cited by County reveals that each involved interests falling within the limits set forth in *Johnson*. In *Hirsch* v. *Department of Motor Vehicles* (1974) 42 Cal.App.3d 252 [115 Cal.Rptr. 452], the court found that the Department of Motor Vehicles was immune from liability for injuries caused by the issuance of permits, licenses and certificates pursuant to sections 818.4 and 821.2 of the Act. Therefore the County was not liable to the purchaser of a stolen car for its issuance of a certificate of ownership to the seller of the car who falsely represented that he was its legal owner and presented documents written entirely in German which were insufficient to show that he legally owned the vehicle. In reference to section 818.8, the court cited an analogous authority, *Brown* v. *City of Los Angeles* (1968) 267 Cal.App.2d 849 [73 Cal.Rptr. 364] in which the court found that " 'an erroneous notification that a person's activities [business operations] violate a zoning ordinance accompanied by a demand that they be discontinued amounts to a misrepresentation within the meaning of section 818.8.' (Pp. 850-851.)" (*Id.,* at p. 256.) Both *Hirsch* and *Brown* involved misrepresentations which invaded interests of a financial or commercial character.

In *Tallmadge* v. *County of Los Angeles* (1987) 191 Cal.App.3d 251 [236 Cal.Rptr. 338], the court held that the immunity applied to misrepresentation by a district attorney that the firearms which were used as exhibits in a criminal prosecution would be returned to the owners without the need to institute legal action. In *Seymour* v. *State of California* (1984) 156 Cal.App.3d 200 [201 Cal.Rptr. 15], the barred cause of action for misrepresentations by state employees concerned an agreement to lease cross-complainant's building. (*Id.,* at p. 205.) In *Page* v. *City of Montebello, supra,* 112 Cal.App.3d 658, the court held that a count of the complaint of a widow and minor daughter of a narcotics informant seeking death benefits from the city and its police department on the basis of an oral promise allegedly made to the decedent and his spouse by a police officer employed by the city, was in actuality an effort to hold the city responsible for the tort of its employee and that section 818.8 constituted a complete defense. In *Polonsky* v. *City of South Lake Tahoe* (1981) 121 Cal.App.3d 464 [176 Cal.Rptr. 319], plaintiffs alleged that they purchased an unimproved lot in a subdivision and that the subdivider had been assured by district personnel that sewer services, prerequisite for obtaining city building permits, would be

available. This was not the case and the district knew it and concealed it. (*Id.*, at p. 466.)

■ Appellants allege misrepresentations and concealment of information concerning Michael's medical condition. The adoption process is not a commercial transaction, such as leasing and purchasing property or contracting for a pension. The immunity provided governmental entities and public employees by sections 818.8 and 822.2 does not shield the County from liability for misrepresentation and deceit in this social service area, designed to serve the interests of society by acting in the best interests of the child. ■ ■ ■ ■ Although appellants suffer a financial loss in the sense that they have incurred, and will continue to incur, substantial medical expenses, their loss did not result from a commercial transaction with the County nor from the County's interference with a commercial transaction.[9]

3. *Considerations of public policy support recognition of a cause of action against an adoption agency for intentional misrepresentation or fraudulent concealment in the adoption process.*

The County and the trial court rely on the rule announced in *Richard P.* v. *Vista Del Mar Child Care Service* (1980) 106 Cal.App.3d 860 [165 Cal.Rptr. 370].

---

[9]Since 1974 adoption agencies have been required to provide prospective adoptive parents a written medical report on the child's medical background, and if available, so far as ascertainable, the medical background of the child's birth parents. (Civ. Code, § 224s, subd. (a).) In 1983, the Legislature adopted the Adoption Information Act of 1983, finding and declaring that "once parental rights have been terminated and a child is legally free for adoption, all contacts between an adoptee and his or her birth parents, usually are permanently severed. When this occurs, often there is no effective way to reestablish contact because of cost problems, tracing difficulties, and the confidentiality of records." (Stats. 1983, ch. 1162, § 2, p. 4393.) The Legislature recognized, "an adopting parent needs complete medical background information on both the adoptee and the adoptee's birth parents, not only to secure timely and appropriate medical care for the adoptee but to make vital personal, health, and family decisions." (*Ibid.*) The Legislature also recognized that "as a result of the permanent severence of the relationship between the adoptee and his or her birth parents, the adoptee also may suffer substantial emotional or physical illness resulting from an inability to satisfy personal needs concerning his or her origins, self-identity, and family medical history." The purpose of the act is to insure that complete medical background information is transmitted to the adopting parents and that it is also available to the adoptee when he or she reaches 21 years of age or is emancipated by reason of marriage, and to establish a procedure whereby birth parents and adult adoptees may discover the identity and location of the other, while providing safeguards respecting the right of privacy of all such persons. The limitation of liability of the state or any licensed adoption agency for damages caused by any act or omission of any of its officers or employees "with regard to the programs authorized by this act" to two hundred fifty dollars ($250) for each such act or omission (*id.*, at §§ 12 and 13, p. 4400) would not apply to misrepresentations in the adoptive process outside of these particular programs.

In *Richard P.,* the adoptive parents of a prematurely born child sued the adoption agency from which they had obtained the child after discovering that he was suffering from " 'extreme emotional and adjustment problems.' " (*Id.,* at p. 863.) The trial court sustained a demurrer to the complaint which was affirmed on appeal. The complaint alleged that the agency informed the plaintiffs that Gregory was premature and had large earlobes but that he otherwise was a healthy child. Commencing the day after Gregory was placed in plaintiffs' home, plaintiffs consulted defendant Dr. K., a pediatrician, to determine Gregory's mental and physical fitness. Apparently Dr. K. found Gregory to be in good health. About three years later, after plaintiffs had adopted Gregory, they discovered that he was suffering from severe neurological damage, hyperkenesia, and neurological immaturity. About three years after that discovery, Dr. K. told the plaintiffs that Gregory's problems were predictable at his birth, basing his opinion on an agency report prepared before Gregory's placement in plaintiffs' home. The report stated that Gregory was premature and "had a poor suck for one week. At the present time there is no neurological disease. . .recommend adoption." The plaintiffs received a copy of the report at the time of his adoption. (*Id.,* at p. 864.)

The court held that in addition to the fact that the agency made a full disclosure of the facts within its knowledge as they existed at the time, plaintiffs conducted their own investigation into the matter; therefore, the requisite element of reliance was lacking in both causes of action for misrepresentation. (*Id.,* at p. 866.)

The court, however, provided another basis for affirming the judgment of dismissal: "More importantly, no cause of action for negligence should be recognized based on considerations of public policy. 'Decisions as to whether to tighten or enlarge "the circle of rights and remedies" [fn. omitted] are often phrased in terms of a "duty of care." ' (*Smith* v. *Alameda County Social Services Agency* (1979) 90 Cal.App.3d 929, 935 [ ].) The real basis of negligence is not carelessness, but behavior which society in general views as involving unreasonable risk of harm to others. (Prosser, Law of Torts (3d ed. 1964) § 31, pp. 148-149.) [¶] . . . [I]t is doubtful that the proposed liability would reduce future harm. 'If anything, it would be more likely to impede the proper functioning of adoption agencies.' (*Smith* v. *Alameda County Social Services, supra,* 90 Cal.App.3d 929, 938, which for public policy reasons rejected a claim by a 17-year-old boy that a county adoption agency, into whose custody he had been relinquished since the age of 2, had negligently failed to take reasonable actions to bring about his adoption.) [¶] In short, to impose liability in a case such as this would in effect make the

adoption agency a guarantor of the infant's future good health. That, of course, would be entirely unreasonable. After all, such a guarantee is unavailable to natural parents who, when fortunate enough to bring into the world a healthy child, have no guarantee whatsoever that the child will continue to enjoy good physical and emotional health." (*Id.,* at pp. 866-867.)

The Supreme Court of Ohio recently acknowledged the validity of a cause of action for wrongful adoption based on misrepresentation of the child's mental or physical condition or parentage. In *Burr v. Board of County Comr's of Stark Cty.* (1986) 23 Ohio St.3d 69 [491 N.E.2d 1101, 56 A.L.R.4th 357], the court affirmed a jury award of $125,000 in favor of adoptive parents who sued the county, alleging that they were fraudulently misled to their detriment by a county employee's material misrepresentations of fact concerning the child's background and condition. There was evidence that the welfare agency represented to appellees that the infant was a nice, big, healthy baby boy when in fact the welfare agency had test records which indicated that the child may have low intelligence and was at risk of disease. The agency further represented that the child's mother was an unwed 18-year-old living with her parents who could not care for the child and wished to move to another state to find employment and had voluntarily signed custody of the child to the county, when in fact the mother was an inmate of a state hospital and the father was presumed to be a mental patient.

The Ohio court said, "If the true facts regarding this child's background and condition at the time of adoption did not present a foreseeable risk of disease of the mind and body, [the welfare agency] would not have had to engage in their complex scheme of deception. It would be a travesty of justice and a distortion of the truth to conclude that deceitful placement of this infant, known by [the agency] to be at risk, was not actionable when the tragic but hidden realities of the child's infirmities finally came to light."[10] (*Id.,* at p. 1107.)

■ We join in the view that an adoption agency cannot be made the guarantor of an infant's future good health and should not be liable for

---

[10] Commenting on the breadth of its decision, the court also stated, "In no way do we imply that adoption agencies are guarantors of their placements. . . .Our decision should not be viewed as altering traditional family relationships and responsibilities, nor should it be read as shifting part of the burden of parenting to society. However, just as couples must weigh the risks of becoming natural parents, taking into consideration a host of factors, so too should adoptive parents be allowed to make their decision in an intelligent manner." (*Burr* v. *Board of County Com'rs of Stark Cty., supra,* 491 N.E.2d 1101, 1109.)

mere negligence in providing information regarding the health of a prospective adoptee. ■■■ But here the evidence raised a triable issue of fact regarding the failure to disclose a material fact within the agency's possession that the examining physician would not render a prognosis for Michael. The significance of that fact at the very least suggests that the nondisclosure was fraudulent.

There are also triable issues of fact concerning the implications of the port wine stain and the County's representation that it was merely a birthmark. Under these circumstances, and recognizing deliberate concealment or misrepresentation would be actionable, we hold that summary judgment is improper.

## CONCLUSION

■■■ By recognizing an action for intèntional misrepresentation or fraudulent concealment, we are not imposing on the agency a duty to predict the future health of a prospective adoptee. However, there must be a good faith full disclosure of material facts concerning existing or past conditions of the child's health. ■■■ If the adoptive parents had been informed of the doctor's refusal to make a prognosis they would have been placed on notice, allowing a consideration of the significance of such refusal and an independent inquiry into the matter. The County was not without the means of resources with which to competently investigate the total medical condition of an obviously blemished child. ■■■ Public policy cannot extend to condone concealment or intentional misrepresentation which misleads prospective adoptive parents about the unusual calamity they are assuming. The adoption of a child is an act of compassion, love and humanitarian concern where the adoptive parent voluntarily assumes enormous legal, moral, social and financial obligations. Accordingly, a trustworthy process benefits society, as well as the child and parent. As keepers of the conscience of the community, we cannot countenance conduct which would allow persons who desire entrance into the emotional realm of parenting to be unprotected from schemes or tactics designed to discharge societal burdens onto the unsuspecting or unwary. As trustees of the child's destiny the agency was obligated to act with morals greater than those found in a purveyor's common marketplace.

## DISPOSITION

Judgment is reversed and the case remanded to the trial court for further proceedings consistent with this opinion. Plaintiffs are awarded costs on appeal.

Klein, P. J., and Danielson, J., concurred.