**M.H. and J.L.H., Respondents,**

**v.**

**CARITAS FAMILY SERVICES,**
**Petitioner, Appellant.**

**Nos. CX–91–406, C9–91–672.**

Supreme Court of Minnesota.

Aug. 21, 1992.

Gordon H. Hansmeier, and Kevin F. Gray, St. Cloud, for petitioner, appellant.

Kay Nord Hunt, Minneapolis, for respondents.

James P. Kempf, Bloomington, for Lutheran Social Services of Minnesota and Catholic Charities of the Archdiocese of St. Paul and Minneapolis, and Children's Home Soc. of Minnesota, amicus curiae.

WAHL, Justice.

We are asked to decide whether public policy precludes an action against an adoption agency for alleged negligent misrepresentations made during the placement of a child in adoption proceedings and to review pre-trial rulings by the district court.

Caritas Family Services (Caritas), defendant in the lawsuit, moved for summary judgment on the grounds that a negligent misrepresentation claim against an adoption agency is precluded on the basis of public policy. The trial court denied the motion, but certified the question as important and doubtful pursuant to Rule 103.-03(h), Minn.R.Civ.App.Pro.[1] Caritas appeals the denial of summary judgment in case number CX–91–406. In case number C9–91–672, M.H. and J.L.H., the plaintiff adoptive parents, appeal the trial court's dismissal of their claim of intentional misrepresentation and its denial of their motion to amend their complaint.

The appeals were consolidated by the court of appeals and decided in *M.H. v. Caritas Family Servs.*, 475 N.W.2d 94 (Minn.Ct.App.1991).[2] The court of appeals affirmed in part by holding as to the certified question that public policy does not preclude an action for negligent misrepresentation under the circumstances in this case and that the trial court had properly denied the H.'s motion to add a claim for intentional infliction of emotional distress.[3] The court of appeals reversed in part by reinstating plaintiffs' claim for intentional misrepresentation and holding that plaintiffs should be permitted to amend their complaint to include claims for negligent infliction of emotional distress and punitive damages. We granted Caritas' petition for review.[4]

Plaintiffs M.H. and J.L.H., who married in 1977, sought to adopt a child after learning J.L.H. was unlikely to conceive a child. Plaintiffs first contacted Caritas Family Services, a Catholic social service agency active in placing children for adoption, in early 1980. In May of that year, they filled out an application for adoption during an interview in their home by a Caritas social worker.

On November 23, 1981, Caritas conducted a second home visit. The purpose of the second visit was, according to Caritas' adoption summary, "to explore with [the H.s] their feelings regarding a child with incest in the background." According to the summary, the H.s "appeared open to any child except one with a very serious mental deficiency."

Two days later, in a telephone conversation, Sister Cathan Culhane, a Caritas social worker, told J.L.H. that Caritas had a child the H.s might wish to adopt. According to J.L.H., Sister Culhane told her there was a "possibility of incest in the family."

1. The certified question, as framed by the district court, reads as follows:
 Does public policy preclude an action against an adoption agency for alleged negligent misrepresentations during the placement of a child in adoption proceedings?

2. Caritas has been denominated appellant and M.H. and J.L.H. as respondents for the purposes of this consolidated appeal.

3. Respondents have not appealed this part of the decision.

4. We also granted leave to Lutheran Social Services of Minnesota, Catholic Charities of the Archdiocese of St. Paul and Minneapolis, and the Children's Home Society of Minnesota to file a brief as Amici Curiae.

J.L.H. said she told sister Culhane, "Well, it's a baby. We're happy. As long as it's in the family, it didn't affect him." Sister Culhane described the baby as having a plugged tear duct and an undescended testicle, but otherwise in good health.

Two days after this telephone call, the H.s met with Sister Culhane in Caritas' office in St. Cloud. Sister Culhane again raised the question of incest and, according to M.H. and J.L.H., asked "Did it matter if there was incest in the family's background?" M.H. said he replied, "No problem, didn't matter to me in the background." According to M.H., Sister Culhane said there was a slight chance that the child might have abnormalities related to incest in his "background." The H.s asked no further questions and there was no more discussion of incest.

At this meeting, Caritas gave the H.s a document with information about the child, including his name, birth date, birth weight and length, cultural heritage, and a description of the genetic parents. The health of the genetic parents was described as follows:

HEALTH Both parents of normal intelligence and in good health as are their parents, brothers and sisters. Older members of their families—(Grandparents' generation) have had coronary trouble, Muscular Dystrophy and also nervous breakdown. One cousin of the natural mother is retarded and an uncle had an ulcer.
Both parents planned for the adoption of their child because they are young, still in school, and unable to assume the role of parents at this time.

The H.s took the baby, C.H., home with them that day. He was 45 days old. The H.s soon noticed that C.H. was jumpy, nervous, cried a lot, and did not sleep very much. The H.s consulted their physician who wanted information as to whether C.H.'s genetic mother had taken drugs during pregnancy. Mrs. H. contacted Sister Culhane who said that the genetic mother was not on drugs during pregnancy.

Sometime between November 1981 and when the adoption became final in September 1982, Caritas sent the H.s a document saying the birth mother was 17 years old instead of 13 as they had been previously told. The document also mentioned the "possibility of incest" but said nothing more specific on the subject. The H.s inquired about the discrepancy in the genetic mother's age and were assured by Sister Culhane that the original information given them about the genetic mother's age (that she was 13) was correct and a new document was sent to replace the mistaken one. Neither the H.s or Sister Culhane discussed incest at this time.

Throughout his childhood, C.H. has had serious behavioral and emotional problems. He has been diagnosed as having attention deficit hyperactivity disorder. He has exhibited hyperactivity, violent behavior when upset (i.e. kicking, biting, pulling hair), and has set fires indoors. On one occasion, he struck, punched, bit, and scratched J.L.H. while she took him to an appointment with his psychiatrist. He has difficulty with small motor skills and has had social problems in school. He is not mentally retarded, however, and his adoptive parents characterize him as smart.

The H.s consulted psychologists to help C.H. regarding his behavior. In 1987, one of the psychologists asked for more information regarding C.H.'s genetic background. In response to this request, Caritas produced and gave to the H.s a 2–page document entitled "Background History of [C.H.]" in December 1987. This document revealed to the H.s, for the first time, that C.H.'s genetic parents were a 17–year old boy and his 13–year old sister. Caritas admits that it knew of this relationship from the time it first considered placing C.H. with the H.s.

Caritas subsequently also disclosed that the genetic father was considered "borderline hyperactive" which caused problems for him in school; that he had tested in the low average range of intelligence; and that he had been seen at the local mental health center at age of 11 for six weeks, but was discharged from treatment because he was not cooperating with his therapist. The H.s were also told that a physician, possi-

bly a neurologist, had prescribed medication for the genetic father's hyperactivity. Caritas has denied knowing this information about the genetic father's mental health history until its inquiry in 1987.

After learning these facts regarding C.H.'s genetic parents, the H.s filed an action against Caritas in October 1989. Count I of their complaint alleged that Caritas failed to disclose the relationship of C.H.'s genetic parents and all relevant history known to Caritas concerning the birth parents with the intent to induce the H.s to adopt the child. Count II alleged that Caritas negligently failed to disclose that information as well as other relevant information it had about the child's genetic parents. The complaint also alleged that because of the misrepresentations, whether intentional or negligent, the plaintiffs had suffered mental pain and anguish and had incurred considerable expense.

During discovery Caritas refused to reveal information relating to what it knew about C.H.'s genetic parents prior to adoption, its attempts to place him with other families, and its sources of information about the genetic parents without a court order permitting it to do so, citing the state adoption statute (Minn.Stat. ch. 259), the Minnesota Government Data Practices Act (Minn.Stat. ch. 13), and unspecified federal regulations. Caritas agreed to stipulate to a court order to permit it to disclose its discussions held between the agency's employees and the adoptive parents, but not its written records. No such order was ever requested, however, or granted by the court.

On October 8, 1990, Caritas moved for summary judgment on both counts of the complaint, the intentional misrepresentation claim on the grounds of insufficient evidence and the negligent misrepresentation claim on grounds of public policy. Caritas also moved for summary judgment on a count of intentional infliction of emotional distress that it anticipated the respondents would try to add to their complaint. Plaintiffs then did move to amend their complaint to add allegations of intentional and negligent infliction of emotional

distress and a prayer for punitive damages. They also moved to compel discovery of Caritas' pre-adoption records.

The district court granted Caritas' motions for summary judgment, except as to negligent misrepresentation. The court certified the question we have before us but denied plaintiffs' motion to compel discovery until after the appellate courts decided whether the negligent misrepresentation cause of action could proceed. These appeals followed.

I.

■ Plaintiffs in the case before us allege that the adoption agency disclosed information about the child's genetic parents but negligently failed to communicate that information fully and accurately and that such negligence caused them damages. Whether public policy precludes an action against an adoption agency for alleged negligent misrepresentation during the placement of a child in adoption proceedings is a question of law and a question of first impression in Minnesota. A review at the outset of cases from jurisdictions that have considered the issue is instructive, however. *See generally* Mary E. Schwartz, Note, *Fraud in the Nursery: Is the Wrongful Adoption Remedy Enough?*, 26 Val.U.L.Rev. 807 (1992). On the one hand, the cases seem to agree that adoption agencies may be held liable for damages caused by intentional, affirmative misrepresentations of facts regarding the child to the adopting parents. *See, e.g., Michael J. v. County of Los Angeles*, 201 Cal.App.3d 859, 247 Cal.Rptr. 504, 512–13 (1988) (public policy does not condone concealment or intentional misrepresentation that misleads adopting parents); *Burr v. Board of County Comm'rs of Stark County*, 23 Ohio St.3d 69, 491 N.E.2d 1101, 1109 (1986) (same). On the other hand, there is agreement that an adoption agency cannot be expected to be "a guarantor of the infant's future good health" and negligence suits tending to have that effect have been rejected. *Richard P. v. Vista Del Mar Child Care Serv.*, 106 Cal.App.3d 860, 165 Cal. Rptr. 370, 374 (1980); *see also Foster v.*

*Bass,* 575 So.2d 967, 980 (Miss.1990). The question we are asked to decide falls between these two extremes: whether public policy bars actions holding adoption agencies liable for damages for negligent misrepresentation of facts concerning the child's genetic parents and medical history.

 We have recognized the tort of negligent misrepresentation, *Bonhiver v. Graff,* 311 Minn. 111, 121–23, 248 N.W.2d 291, 298–99 (1976), but conduct actionable against one class of defendant is not automatically actionable against another class of defendants. Tort liability in the first instance always depends on whether the party accused of the tort owes a duty to the accusing party. *L & H Airco., Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 378 n. 3 (Minn.1989). If such a duty is owed, then one who undertakes to act must, under common law principles, act with reasonable care. *Wills v. K–Mart Corp.,* 354 N.W.2d 442, 444 (Minn.1984). No duty is owed, however, unless the plaintiff's interests are entitled to legal protection against the defendant's conduct. *L & H Airco.,* 446 N.W.2d at 378 (citing Prosser & Keaton on Torts § 53, at 357 (5th ed. 1984)). Whether the plaintiff's interests are entitled to legal protection against the defendant's conduct is a matter of public policy. *Id.* Which brings us to the certified question stated somewhat more precisely: Does public policy favor legal protection of the interests of adoptive parents against the negligent conduct of adoption agencies?

Caritas and amici adoption agencies emphatically answer that question in the negative. They ask this court to hold as a matter of law that public policy precludes recognition of a legal duty of care with regard to negligent representations of fact by adoption agencies to adoptive parents. They argue that recognition of such a duty would place an unreasonable burden on adoption agencies by requiring them to independently verify family histories given them by the genetic parent. Adoptions would be discouraged, they say, if agencies were required to disclose information that might render certain children more difficult to place or would unnecessarily stigmatize them once adopted. They further argue it is unreasonable to impose liability on agencies for negligently failing to discover certain aspects of a child's genetic history when the number of genetic-related conditions and the cost of tests to discover them are increasing at a rapid rate. Finally, Caritas and amici argue that requiring adoption agencies to defend negligent misrepresentation suits would conflict with confidentiality policies required by state and federal law to protect the identity of genetic parents.

We appreciate that these are legitimate policy concerns. We recognize the unique nature and mission of adoption agencies as they seek to meet both the need of adoptive parents to experience the joys and challenges of parenthood and the need of every child to have a stable, loving family. We also recognize, however, the compelling need of adoptive parents for full disclosure of medical background information that may be known to the agency on both the child they may adopt and the child's genetic parents, not only to secure timely and appropriate medical care for the child, but also to make vital personal, health and family decisions.

While under other circumstances the policy concerns of the adoption agencies may preclude a cause of action, on the facts of this case, the policy concerns are not implicated. Plaintiffs do not allege that Caritas insufficiently investigated C.H.'s background: Caritas knew from the start of these adoption proceedings that C.H.'s genetic parents were brother and sister. Neither do plaintiffs assert that Caritas had a duty to test C.H. for genetic abnormalities. There is no suggestion nor do plaintiffs allege that Caritas had an affirmative common law duty to disclose facts surrounding C.H.'s parentage beyond those required by statute or administrative rule.[5] Furthermore, confidentiality policies are necessary

---

**5.** *See, e.g.,* Minn.R. 9560.0060 (1991) (adoption agencies required to provide adoptive parents with written health history of the child that is understandable and meaningful to the adoptive family).

to protect the identity of the genetic parents, not to inhibit communication of vital health and medical information. Plaintiffs assert only that once Caritas undertook to disclose the information that incest existed in C.H.'s background, it assumed a duty to use due care that its disclosure be complete and adequate to ensure that the adoptive parents were not misled as to the true nature of their son's genetic parentage. This is the common law duty plaintiffs allege Caritas breached.

We long ago recognized that even if one has no duty to disclose a particular fact, if one chooses to speak he must say enough to prevent the words from misleading the other party. *Newell v. Randall*, 32 Minn. 171, 172–73, 19 N.W. 972, 973 (1884). *See also Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972). We have also held that a duty to disclose facts may exist "when disclosure would be necessary to clarify information already disclosed, which would otherwise be misleading," particularly when a confidential or fiduciary relationship exists between the parties. *L & H Airco*, 446 N.W.2d at 380. We are not persuaded that adoption agencies should be immune from this common law rule.[6] Recognition of this duty imposes no extraordinary or onerous burden on adoption agencies. It merely requires them to use due care to ensure that when they undertake to disclose information about a child's genetic parents and medical history, they disclose that information fully and adequately so as not to mislead prospective adoptive parents. Caritas had a legal duty to not mislead plaintiffs by only partially disclosing the truth.

The district court, in denying Caritas' motion for summary judgment on negligent misrepresentation on policy grounds, and the court of appeals in affirming that denial, relied on *Meracle v. Children's Serv. Soc. of Wis.*, 149 Wis.2d 19, 437 N.W.2d 532 (1989). In *Meracle*, the Wisconsin Supreme Court recognized a cause of action where an adoption agency negligently told adoptive parents that, though

the child's paternal grandmother had Huntington's Disease, the child's genetic father had tested negative for that disease, thus negating the child's chances of developing the disease. In fact no such test existed and the father could not have been tested. *Id.* 437 N.W.2d at 533. The court recognized that public policy requires that adoption agencies should not be exposed to unlimited liability or be made guarantors of the health of children they place in adoptive homes. *Id.* at 537. It held, however, that public policy did not bar a negligent misrepresentation action when the agency assumed a duty of informing adoptive parents about the child's health history but did so negligently. "To avoid liability, agencies simply must refrain from making affirmative misrepresentations about a child's health." *Id.* *See also Roe v. Catholic Charities*, 225 Ill.App.3d 519, 167 Ill. Dec. 713, 724, 588 N.E.2d 354, 365 (1992).

We, like the court of appeals, find *Meracle* persuasive. Like the *Meracle* court, we reject the argument that potential liability will inhibit adoptions. "Indeed, [our decision] will give potential parents more confidence in the adoption process and in the accuracy of the information they receive. Such confidence would be eroded if we were to immunize agencies from liability for false statements made during the adoption process." *Meracle*, 437 N.W.2d at 537. This is particularly true because adoption agencies are the adoptive parents' only source of information about the child's medical and genetic background.

We hold that public policy does not preclude a negligent misrepresentation action against an adoption agency where the agency, having undertaken to disclose information about the child's genetic parents and medical background to the adoptive parents, negligently withholds information in such a way that the adoptive parents were misled as to the truth. We affirm the court of appeals and answer the certified question in the negative.

---

**6.** If there are policy considerations that should override the agency's common law liability for misrepresentation, the legislature is the appropriate body to extend such immunity.

## II.

■ The district court granted Caritas summary judgment on plaintiffs' intentional misrepresentation claim because it found that Caritas had made no affirmative misrepresentation to plaintiffs: Plaintiffs argue that Caritas made two discrete misrepresentations, one regarding the incest in C.H.'s background and the other by affirmatively stating that C.H.'s genetic father was in "good health." Plaintiffs argue that either representation was specific enough to support their claim of intentional misrepresentation. The court of appeals agreed and reinstated the claim for both representations.

■ An intentional misrepresentation claim requires plaintiffs to allege that defendant (1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation. *Florenzano v. Olson*, 387 N.W.2d 168, 174 n. 4 (Minn.1986). A misrepresentation may be made either (1) by an affirmative statement that is itself false or (2) by concealing or not disclosing certain facts that render the facts that are disclosed misleading.

The statements Caritas made regarding incest were of the latter type. Their falsity arose, if at all, from Caritas' failure to disclose additional facts, not from the statements themselves which were true on their face. Plaintiffs, however, have not alleged any facts or produced any evidence implying that Caritas intended to mislead plaintiffs by deliberately withholding the full facts regarding incest in C.H.'s background. Indeed, the evidence suggests the opposite: if Caritas intended to mislead plaintiffs, it is unlikely it would have raised the question of incest with them at all. In the absence of evidence that the statements regarding incest were calculated to mislead plaintiffs, they were insufficient as a matter of law to establish a case of intentional misrepresentation.[7]

Neither will Caritas' statement regarding the genetic father's "good health" support an intentional misrepresentation claim because plaintiffs have not shown it was either false on its face or deliberately misleading. Caritas' statement in 1981 that the genetic father was in good health is not made false by the fact that the genetic father had been hyperactive and had undergone psychiatric treatment several years before. Plaintiffs must, therefore, produce evidence that Caritas intentionally misled them by withholding the information. Even if Caritas knew of the genetic father's mental health history in 1981,[8] plaintiffs have not produced any facts to suggest that Caritas' failure to disclose that fact was intended to mislead them.

We reverse the court of appeals and hold that the district court properly granted defendant Caritas summary judgment on the intentional misrepresentation claim.

## III.

■ Plaintiffs moved the trial court to amend their complaint to add claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and punitive damages. The trial court denied the motion, holding that the dismissal of the intentional misrepresentation claim left the record bare of allegations of outrageous and willful misconduct required

---

**7.** Plaintiffs contend that Caritas' refusal to grant them access to its pre-adoption records should estop it from receiving summary judgment on this claim. The records might contain direct evidence of Caritas' intent to mislead plaintiffs by deliberately referring to the incest in an oblique manner calculated to obscure the actual truth. Plaintiffs did not file a motion to compel discovery of these records until more than a year and three months after the suit was filed and over three months after Caritas filed its motion for summary judgment, however. Having delayed so long, they cannot now complain that they lack the facts to support their complaint.

**8.** Caritas asserts it did not learn of those problems until 1987.

for either claim of infliction of emotional distress and the punitive damages claim. The court of appeals, having reinstated the intentional misrepresentation claim, reversed.

 Infliction of emotional distress, whether intentional or negligent, generally requires plaintiffs to suffer a physical injury as evidence of their severe emotional distress. *Stadler v. Cross,* 295 N.W.2d 552, 553 (Minn.1980). Because plaintiffs have alleged no physical injury resulting from their alleged emotional distress,[9] their motion to amend was properly denied unless they alleged a "direct invasion" of their rights by "willful, wanton, or malicious conduct." *State Farm Mut. Auto. Ins. Co. v. Village of Isle,* 265 Minn. 360, 367–68, 122 N.W.2d 36, 41 (1963). There is no evidence of such a direct invasion of plaintiffs' rights, or of willful, wanton, or malicious conduct on the part of Caritas. Plaintiffs have provided no evidence that Caritas deliberately misled them, much less wantonly did so. We therefore reverse the court of appeals and hold that the district court did not abuse its discretion in denying plaintiffs leave to amend their complaint to add claims of intentional and negligent infliction of emotional distress.

Similarly, plaintiffs have not alleged sufficient facts to support a finding that there is "clear and convincing evidence that the acts of the defendant show a deliberate disregard for the rights or safety of others" required to recover punitive damages. Minn.Stat. § 549.20, subd. 1(a) (1990); *Shetka v. Kueppers, Kueppers, Von Feldt and Salmen,* 454 N.W.2d 916, 918 n. 1 (Minn.1990). The court of appeals is therefore reversed and the district court's denial of leave to add a claim for punitive damages is affirmed.

The certified question is answered in the negative; the judgment of the trial court dismissing the intentional misrepresentation claim and denying leave to add claims for negligent infliction of emotional distress and for punitive damages is reinstated.

Case remanded for trial.

---

9. The injuries inflicted on J.L.H. by C.H. were not a result of J.L.H.'s mental distress.