In re HEALTH RISK MANAGEMENT, INC., et al., Debtors.

Timothy D. Moratzka, Trustee in Bankruptcy for the Estate of Health Risk Management, Inc., Plaintiff,

v.

Loop Corporation, a South Dakota corporation; Andrew A. Jahelka; Chiplease, Inc., a South Dakota corporation; Banco Panamericano, Inc., a South Dakota corporation; Leon A. Greenblatt, III; and Leslie Jabine, Defendants.

Bankruptcy Nos. 01–43354 to 01–43357. Adversary No. 03–4113.

United States Bankruptcy Court, D. Minnesota.

Jan. 13, 2005.

James L. Baillie, Fredrikson Byron PA, Minneapolis, MN, for Debtors.

*MEMORANDUM OPINION AND ORDER*

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial on September 20, 2004. Stephen P. Kelley and Andrew P. Moratzka appeared for the plaintiff and C. Philip Curley, Susan Valentine, and Mary Jo A. Jensen–Carter appeared for the defendants.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B).

## PARTIES

Health Risk Management, Inc., provided health care management services and operated health care plans in Pennsylvania through its wholly owned subsidiary, HRM Health Plans (commonly referred to as HRMPA). Loop Corporation is a South Dakota corporation with its principle place of business in Chicago, Illinois. At the relevant time, Loop Corporation was a holding company that owned common stock in HRM. Loop is owned by Andrew Jehelka, Leon Greenblatt, III, and Richard Nichols. Chiplease, Inc. is a South Dakota corporation with its principle place of business in Chicago, Illinois. Banco Panamericano is a South Dakota corporation with its principle place of business in Chicago, Illinois. Leslie Jabine is a resident of Cook County, Illinois. Chiplease, Banco Panamericano, and Jabine all owned stock in HRM.

## FACTS

On May 1, 2003 the trustee filed a complaint with eight causes of action including: (1) breach of fiduciary duty, (2) conversion, (3) preferential transfer, (4) vicarious liability for Loop Corp., (5) vicarious liability for Chiplease, Banco Panamericano, Greenblatt and Jabine, (6) fraud, (7) breach of contract, and (8) unjust enrichment. I granted summary judgment on causes of action 1–6 and 8 on July 28, 2004 and the matter proceeded to trial on the

breach of contract claim against Loop and Loop's counterclaim for rescission and return of $3 million.

The complaint is based on events surrounding a financing agreement between Loop and the debtors under which Loop was to provide $6 million in financing to HRMPA. The financing agreement consisted of two parts, one which Loop completed and one which it did not.

Health Risk Management, Inc. and three related entities filed Chapter 11 petitions on August 7, 2001. The cases were converted to Chapter 7 on March 13, 2002 and the plaintiff was appointed trustee.

On February 28, 2001 HRMPA filed its Annual Statement with the company's government regulator, the Pennsylvania Department of Insurance. The annual statement indicated that the company had insufficient capital reserves, and the Department informed HRMPA that the company would come under its control unless it strengthened its financial condition. The Department requested HRMPA to create a Risk Based Capital Plan as required under Pennsylvania law to demonstrate how it would meet its capital reserve requirements and improve its overall financial condition.[1]

As the financial problems at HRM were coming to light in January 2001, Ernst & Young was doing an audit of the company's December 31, 2000 financial reports. This was not however, the only audit done on the December 31, 2000 numbers. On February 2, 2001, HRM's Chief Financial Officer Leland LeBlanc, hired the actuarial firm of Milliman & Robertson, Inc. to "prepare an independent estimate of the liability for Claims Payable as of December 31, 2000."[2] The stated purpose of this estimate was for HRM's internal use to compare against E & Y's estimates of claim liability. In its report to HRM dated February 12, 2001, Milliman determined that the numbers eventually certified by E & Y in the December 31, 2000 10–K were misstated by $7 million. Leblanc informed then CEO Gary McIlroy and E & Y that he had hired Milliman, but there is no evidence that anybody passed this information on to Loop or to Andrew Jehelka in his capacity as an investor or executive committee member.

The Risk Based Capital Plan indicated that Loop would provide financing to HRMPA based on terms contained in a master agreement. On March 23, 2001, Loop sent HRM a letter of intent which contained the understandings of Loop and HRM regarding Loop's proposed investment. This would have been a good time for HRM to inform Loop about the Milliman audit, but it did not. The parties agreed to the terms contained in the letter on March 28, 2001.

The letter of intent conditioned the financing agreement on a number of things including changes in corporate governance and due diligence. As part of the changes in corporate governance, HRM's CEO resigned and Andrew Jahelka, the president of Loop, joined the audit committee and became one of five members of the executive committee serving in the role of CEO.[3] The Letter of intent stipulated that the

---

1. This report was required under Pennsylvania law 40 Pa.Code § 221.2–B(b)(2004).

2. Claims payable is a component of the Medical Loss Ratio. The MLR is a comparison of the amount of insurance premiums received by the company to the amount of claims payable to customers. It is a measure of the financial viability of the company. As the claims payable increases, the MLR increases thereby reducing the company's profitability.

3. A corporate resolution dated March 28, 2001 created the executive committee and announced Dr. McIlroy's retirement.

parties would create a mutually acceptable, definitive agreement which would incorporate the terms of the letter of intent.

The parties created the Master Agreement which they intended to be the "definitive agreement" between the two parties.[4] The Master Agreement indicated two separate transactions that would result in an infusion of a total of $6 million into HRM and HRMPA to help HRMPA meet its regulatory requirements.

The first transaction discussed in the Master Agreement involved Loop purchasing a $3 million debenture from HRM. The parties arranged for this transaction to occur through an account HRM established at Credit Suisse First Boston. HRM transferred the debenture to CSFB, but CSFB never notified Loop it was prepared to execute the transaction. According to LeBlanc, the transaction scheduled to occur on May 15, 2001 did not occur because of internal issues at CSFB. The trustee's breach of contract claim is based on the failed debenture transaction.

The Master Agreement contemplated a second transaction, which did occur but not exactly as described in the Master Agreement. The Master Agreement called for Loop to contribute its limited partnership interest in an Illinois LLP to HRM. Soon before the scheduled execution of the Master Agreement on May 15, 2001, the Pennsylvania Department of Insurance determined that HRM needed an infusion of $6 million in *cash*. The parties abandoned the plan to transfer partnership interests and negotiated a cash transaction to satisfy the Department's requirements. Loop secured $3 million in cash by refinancing a commercial office building in Chicago late on May 15, 2001. Jahelka accepted and held the check for HRM and deposited that amount in HRMPA's U.S. Bancorp account on May 16, 2001.

HRM was late in filing its year-end financial report for 2000.[5] Although under the Master Agreement, Loop had a right to do its own audit, it decided to forgo doing one. For this reason, Loop wanted to wait to sign the Master Agreement until E & Y released its report. E & Y did not release its report until May 4, 2001. After the release of the audit report, discussion ensued among HRM management, the audit committee, and E & Y regarding the medical claims payable liability.

In an Audit Committee meeting held at 9:00am on May 10, 2001, the members, including Jehelka, discussed the possibility of a misstatement on the medical claims payable liability. On May 15, 2001 the audit committee learned that the disagreement on the numbers in the medical claims payable liability between LeBlanc and E & Y had been resolved. This too would have been an excellent opportunity to inform Loop that Milliman had done an audit indicating that the medical claims payable liability had been underestimated by $7 million, but again nothing was said.

Loop and HRM signed the Master Agreement on May 15, 2001. On May 18, 2001 E & Y resigned as HRM's auditor and withdrew its opinion on the year end 2000 financials because it disclosed that the medical claims liability in the financials had been understated by $2.8 million. The

---

4. The parties actually signed two different versions of the Master Agreement which differed as to the amounts and the parties involved in the transaction. Fortunately, the differences in the two versions of the "definitive agreement" are not germane to the outcome.

5. HRM informed the Securities and Exchange Commission of its late filing in a Form 12b-25 filing on 04/03/01. HRM indicated it needed more time to gather information and complete the audit.

second transaction never took place. HRM and E & Y blamed each other for the misstatement in a Form 8–K filed with the SEC. HRM hired Milliman to do a new actuarial analysis on the medical claims liability and received its second report on June 18, 2001 indicating again that the misstatement amounted to $7 million.

## DISCUSSION

### Breach of Contract

■ The elements of a breach of contract action are (a) formation of a contract, (b) performance by the plaintiff of any conditions precedent to the right to demand performance by the defendant (c) breach of the contract by the defendant, and (d) damages. *Indust. Rubber Applicators, Inc. v. Eaton Metal Prods., Co.*, 285 Minn. 511, 171 N.W.2d 728, 731 (1969); *Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 105 (Minn.App.1987).

■ Defenses to a breach of contract claim include mutual mistake and misrepresentation. A court may rescind an agreement if both parties were mutually mistaken about material facts. *Gartner v. Eikill*, 319 N.W.2d 397, 398 (Minn.1982); Restatement (Second) of Contracts § 152(1) (1981). Additionally, an agreement is voidable if it is entered into based on fraud or misrepresentation. *Carpenter v. Vreeman*, 409 N.W.2d 258, 260–261 (Minn.App.1987); Restatement (Second) of Contracts § 162(2) (1981).

■ The Master Agreement constituted a valid contract between the parties. The trustee argues that Loop breached the contract by not performing the first transaction in the Master Agreement. Loop argues that it did not breach the contract, but even if it did, it is entitled to rescission based on mutual mistake or misrepresentation.

### Mutual Mistake

■ Mutual mistake consists of a clear showing that both contracting parties misunderstood the fundamental subject matter or term of the contract. *Dubbe v. Lano Equip., Inc.*, 362 N.W.2d 353, 356 (Minn.App.1985). If there is a mutual mistake concerning a material fact, parties to a contract may avoid the contract. *Winter v. Skoglund*, 404 N.W.2d 786 (Minn.1987). A contract may be avoided on the grounds of mutual mistake if the party seeking to avoid the contract did not assume the risk of the mistake. *Gartner v. Eikill*, 319 N.W.2d 397, 398–399 (Minn.1982). A material fact is one that is so substantial and fundamental that a mistake defeats the object of the parties who made the contract. The mistake must be more than just the monetary value of the item, but must go to the very nature of the deal. *Gartner*, 319 N.W.2d at 399.

■ If the mistake of a material fact was mutual, then the contract is voidable unless a party assumed the risk of the contract. *Id.* A party can assume the risk of a contract under three different scenarios. Firstly, risk is allocated to a party by the contract. Secondly, a court can assign the risk to a party because it is reasonable to do so. Thirdly, a party is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates, but treats that lack of knowledge as sufficient. Restatement (Second) of Contracts § 154 (1981).

To assist in determining the materiality of a misstatement, the Restatement instructs a court to consider "the purposes of the parties" and "its own general knowledge of human behavior in bargain transactions." Restatement (Second) of Contracts § 154 cmt. d (1981). The purpose of the contract between the two par-

ties was to make HRMPA's Risk Based Capital Plan viable to meet the capital requirements of the Commonwealth of Pennsylvania Insurance Department. It later became evident that even with Loop's financing, HRMPA would not be viable because of miscalculations in the medical claims payable liability and in reality the company was insolvent by December 31, 2000. The misstatement created a fundamental mistake that went to the purpose of the contract's formation.

However, Loop assumed the risk of the contract because it knew at the time it executed the contract that it had only limited knowledge about the facts relating to the contract, and treated its limited knowledge as sufficient. As part of the letter of intent dated March 23, 2001, Loop made execution of the final agreement contingent on due diligence, but Loop waived its contingent rights which include the right to do due diligence. Had Loop chosen to do its own due diligence, it would likely have determined, on its own, the misstatements and not entered into the contract. The contract is not void based on mutual mistake because Loop assumed the risk of the mistake by not performing due diligence which it had a right to do.[6]

### *Misrepresentation*

#### A.

■ If a contract is entered into based on a misrepresentation that is either material or fraudulent, it is voidable. *Carpenter,* 409 N.W.2d at 260–261 *citing* Restatement (Second) of Contracts § 164(1) (1981). A misrepresentation is defined as "an assertion that is not in accord with the facts." Restatement (Second) of Contracts § 159 (1981). An assertion can be a non-disclosure of a fact where the person making the assertion knows that disclosure of

the fact is necessary to prevent a previous assertion from being a misrepresentation. Restatement (Second) of Contracts § 161 (1981).

### Material Misrepresentation

■ A contract is voidable if a party's manifestation of assent is induced by a material representation. Restatement (Second) of Contracts § 164(1) (1981). A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or the maker knows it will likely induce the recipient to assent. *Carpenter,* 409 N.W.2d at 261; Restatement (Second) of Contracts § 162(2) (1981). A misrepresentation induces a party's assent if it substantially contributes to his decision to assent. Restatement (Second) of Contracts § 167 (1981).

■ There are two elements to material misrepresentation. Firstly, the individual has to have made a misrepresentation and secondly, the misrepresentation must be material. *Gully v. Gully,* 599 N.W.2d 814, 821 (Minn.1999). A misrepresentation may be made by either (1) an affirmative statement that is false or (2) concealing or not disclosing certain facts that render the facts that are disclosed as misleading. *M.H. and J.H.L. v. Caritas Family Services,* 488 N.W.2d 282, 289 (Minn.1992).

■ This does not mean however, that there is an obligation to disclose information. The general rule is that "one party to a transaction has no duty to disclose material facts to the other." *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 622 (1972). In certain circumstances however, a duty to disclose does arise. One of those situations is

---

**6.** It is also open to question whether this was a *mutual* mistake. HRM had the February 12, 2001 report from Milliman, and it knew

there was a serious question about the medical claims payable.

when disclosure would be necessary to clarify information already disclosed, which would otherwise be misleading. *Id.* A material fact is one that is so substantial and fundamental that a mistake defeats the object of the parties who are making the contract. *Gartner,* 319 N.W.2d at 399.

## Fraudulent Misrepresentation

 A contract is also voidable if a party's manifestation of assent is induced by a fraudulent misrepresentation. *Carpenter,* 409 N.W.2d at 260; Restatement (Second) of Contracts § 164(1) (1981). A misrepresentation is fraudulent if the "maker knows or believes the assertion is not in accord with the facts" Restatement (Second) of Contracts § 162(1) (1981). According to the Restatement, a fraudulent misrepresentation need not be material in order to entitle the recipient to relief, but a non-fraudulent misrepresentation will not entitle him to relief unless it is material. Restatement (Second) of Contracts § 162 cmt. c (1981).

## Minnesota's Version

 In Minnesota, the courts do not really distinguish very well between fraudulent and material misrepresentation.[7] To prove a fraudulent misrepresentation in Minnesota, a party must show (1) there was a misrepresentation, (2) the misrepresentation was false, (3) the representation must concern past or present facts, (4) the fact must be material, (5) the fact must be susceptible to knowledge, (6) the representor must have known the fact to be false or asserted such knowledge without knowing if it were true of false, (7) the representor must have intended that the

other person be induced to act, (8) the other person must have been so induced to act or so justified in acting, (9) the person's actions must have been in reliance on the representation, (10) the person must have suffered damage, (11) the damage must be attributable to the representation. *Weise v. Red Owl Stores, Inc.,* 286 Minn. 199, 175 N.W.2d 184 (1970); *Johnson Bldg. Co. v. River Bluff Dev. Co.,* 374 N.W.2d 187, 193–194 (Minn.App.1985). In the present case the misrepresentation made was both material and fraudulent.

## B.

 When HRM hired Milliman on February 2, 2001 to prepare an estimate of the medical claims liability, it learned the amounts were misstated by $7 million. If this information were true, that would mean that HRMPA was insolvent as of December 31, 2000. HRM chose not to share this information with Loop. Because HRM had issued financial statements with significantly different information, this resulted in a misrepresentation to Loop about HRM's financial viability. The misrepresentation in this case was HRM's silence about hiring Milliman and Milliman's subsequent report. Leblanc hired Milliman because he wanted it to "prepare an independent estimate of the liability for Claims Payable as of December 31, 2000." Loop relied on HRM's silence and assumed the financials reported in the December 31, 2000 10–K to be correct when HRM knew they were not. HRM's silence rendered the facts disclosed misleading and Loop entered into the contract based on the silence.

7. In Minnesota, materiality is an element of fraudulent misrepresentation. *Davis v. Re-Trac Mfg. Corp.,* 276 Minn. 116, 149 N.W.2d 37 (1967) includes in the elements of fraud a materiality element. *Weise v. Red Owl Stores, Inc.,* 286 Minn. 199, 175 N.W.2d 184 (1970) includes as an element of "fraudulent misrepresentation" a materiality element. *Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 4. Citing *Hanson v. Ford Motor Co.,* 278 F.2d 586, 591 (8th Cir.1960) following Minnesota law.

The information is material because an investor like Loop would clearly want to know if the numbers upon which it is relying are so incorrect as to render the investment insolvent.[8] A material fact is one that is so substantial and fundamental that a mistake defeats the object of the parties who are making the contract. *Gartner*, 319 N.W.2d at 399. If HRM had a sense that the numbers reported were incorrect and hired an auditor who reported the numbers were incorrect then that information is clearly material. Without that knowledge, an investor like Loop would rely on the reported numbers.

HRM needed a cash investment to satisfy the Commonwealth of Pennsylvania Department of Insurance. It wanted Loop to make the investment and knew Loop would likely not invest if it knew about the financial misstatements in the December 31, 2000 10–K. HRM therefore intended for Loop to rely on its silence about the accuracy of the 10–K.

Reasonable and justifiable reliance are two different standards, but Minnesota courts have at times used the terms synonymously.[9] While the element stated often contains the term "justified", the language in the opinion often refers to reasonable action. Based on the analysis done by the United States Supreme Court, it becomes clear that Minnesota has adopted a justifiable reliance standard.

The Supreme Court analyzed the difference between justifiable and reasonable reliance under 11 U.S.C. § 523(a)(2)(A) as it relates to common law fraud in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The Court looked first to the Restatement (Second) of Torts § 537 (1976). In this section the Restatement indicates that both actual and justifiable reliance are required for the tort of fraudulent misrepresentation. It is generally recognized in contract law that if a misrepresentation is material, the recipient probably relied on it. *Kungys v. U.S.*, 485 U.S. 759, 788, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988).

Importantly, the Restatement indicates that a person is justified in relying on a representation of fact "although he may have ascertained the falsity of the representation if he had made an investigation." *Field*, 516 U.S. at 70, 116 S.Ct. 437. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than a community standard of conduct to all cases." Restatement (Second) of Torts § 545A (1976). The Court recognized the difference between justifiable and reasonable reliance by indicating that conduct must be justifiable but does not necessarily need to conform to the conduct of the reasonable man as required under the reasonable reliance standard. *Field*, 516 U.S. at 71, 116 S.Ct. 437.

Using the justifiable reliance standard requires that the individual must "use his senses, and cannot recover if he blindly

---

**8.** In a securities context, the United States Supreme Court indicated that "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

**9.** Cases that refer to reliance as justified include: *Davis v. Re–Trac Mfg. Corp.* 276 Minn. 116, 149 N.W.2d 37 (1967); *Weise v. Red Owl Stores, Inc.* 286 Minn. 199, 175 N.W.2d 184 (1970); *Swanson v. Domning*, 251 Minn. 110, 86 N.W.2d 716 (1957); *Spiess v. Brandt*, 230 Minn. 246, 41 N.W.2d 561 (1950). Cases referring to reasonable reliance include: *In re Strid*, 487 N.W.2d 891 (Minn.1992); *Petition of Anderson*, 565 N.W.2d 461 (Minn.App. 1997).

relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Restatement (Second) of Torts § 541 Cmt. a. (1976). Prosser Law of Torts agrees that justifiable reliance is the proper standard in a fraudulent misrepresentation case. "The matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may be fairly charged against him from the facts within his observation in the light of his individual case." W. Keeton et al., Prosser and Keeton on the Law of Torts § 108 at 751 (5th ed.1984).

 To find fraud in Minnesota, a court must determine the specific intelligence and experience of the party rather than using a reasonable man standard. *Murphy v. Country House, Inc.*, 307 Minn. 344, 240 N.W.2d 507, 512 (1976). In Minnesota the reliance of an individual can be inferred by the conduct of the party. *Davis v. Re–Trac Mfg., Co.* 276 Minn. 116, 149 N.W.2d 37, 39 (1967). The question of reasonableness is also one of fact. For example, if a party to whom a representation has been made does not make an independent inquiry into the falsity of the information, the party whose misrepresentations induced the act cannot escape liability by claiming the other party ought not to have trusted him. *Id.*

It is reasonable for an investor to rely on year-end, audited financial statements filed with the SEC in a 10–K. It is also reasonable, even for a sophisticated investor, to rely on a party's silence regarding possible errors in audited financial state-ments especially under the fairly exigent circumstances that existed here. While HRM is normally under no obligation to disclose information, it should have in this situation because its silence made disclosed information misleading.[10]

Loop is a sophisticated investor. It is reasonable however, for it to rely on HRM's audited financial statement and on HRM's silence to any contrary audit which indicated a computational error in the medical claims payable liability of $7 million.[11] If HRM had not remained silent and informed Loop it knew of the error, Loop would have known that HRMPA was insolvent as of December 31, 2000 and would not have made the investment.

 Loop suffered damages as a result of its reliance on HRM's misrepresentation. The amount of damages in a misrepresentation action is to be determined by the trier of fact. *Strouth v. Wilkison*, 302 Minn. 297, 224 N.W.2d 511, 514 (1974). Damages are limited to the actual-out-of-pocket loss sustained by the plaintiff as a proximate result of the other party's fraud. Normally this amount is the difference between the actual value of the property received and the amount paid for it in addition to other damages. *Id.*

### Rescission

In its counterclaim, Loop requested rescission of the Master Agreement and a return of its initial $3 million investment. In the second transaction, Loop paid to HRM $3 million in cash which represented proceeds from a refinance of real estate. Both the first and second transactions are part of the Master Agreement whose pur-

**10.** See *M.H. and J.H.L. v. Caritas Family Services,* 488 N.W.2d 282, 289 (Minn.1992).

**11.** The Minnesota Supreme Court indicated that the proper standard for determining reasonable reliance is whether the misrepresen-tation was calculated to deceive a person of the capacity and experience of that individual who received the misrepresentation. *Berg v. Xerxes–Southdale Office Building, Co.* 290 N.W.2d 612, 616 (Minn.1980).

pose was to provide financing for HRM and HRMPA. Jehelka deposited the $3 million check into HRM's USBancorp account on May 16, 2004 as a partial satisfaction of the contract. The first transaction did not take place and forms the basis of the trustee's breach of contract claim. Loop received nothing in return for its $3 million contribution and seeks a return of that money because it was induced into the contract by fraudulent or material misrepresentation.

## CONCLUSION

The contract between Loop Corp. and HRM was procured by HRM's material and fraudulent misrepresentation, entitling Loop to rescind the contract. Loop suffered $3 million in damages from the second transaction. Loop suffered these damages because it relied on HRM's silence thereby indicating the numbers upon which Loop relied were accurate. While Loop is not entitled to a money judgment against the trustee, it is entitled to a claim in the case for the return of its $3 million.

## ORDER

THEREFORE, IT IS ORDERED:

1. The plaintiff shall recover nothing from defendant Loop Corporation.

2. Defendant Loop Corporation is entitled to a claim of $3 million.

LET JUDGMENT BE ENTERED ACCORDINGLY.