James R. WILLIAMS, Respondent,

v.

Orlando Henry "Tubby" SMITH,
et al., Appellants.

Nos. A10–1802, A11–0567.

Supreme Court of Minnesota.

Aug. 8, 2012.

Rehearing Denied Oct. 2, 2012.

Donald Chance Mark, Jr., Alyson M. Palmer, Fafinski Mark & Johnson, P.A., Eden Prairie, MN; Richard G. Hunegs, Hunegs LeNeave & KVAS, P.A., Minneapolis, MN; and Charles E. Spevacek, William M. Hart, Damon L. Highly, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondent.

Mark B. Rotenberg, General Counsel, Brian J. Slovut, Jennifer L. Frisch, Associate General Counsel, University of Minnesota, Minneapolis, MN; and David L. Lillehaug, Fredrikson & Byron, P.A., Minneapolis, MN, for appellants.

Susan L. Naughton, St. Paul, MN, for amicus curiae League of Minnesota Cities.

## OPINION

DIETZEN, Justice.

The issue presented in this case is whether the court, as a matter of public policy, should extend the protection against negligent misrepresentation to prospective employees of the University of Minnesota, which is a constitutional corporation and agency of the state.

Respondent James R. Williams brought a claim against appellants the University of Minnesota (University) and Orlando Henry "Tubby" Smith for negligent misrepresentation, alleging that Smith, the University's men's basketball coach, offered him the position of assistant coach, that he negligently misrepresented that he had authority to hire Williams, and that Williams suffered damage. The University argued, among other things, that the district court lacked subject-matter jurisdiction over the claim. The jury found in favor of Williams and awarded damages. The district court granted the University's and Smith's motion to reduce the jury's award, but otherwise denied their motion for judgment as a matter of law. The court of appeals affirmed the district court. We conclude that the district court had subject-matter jurisdiction to address Williams' negligent misrepresentation claim. Additionally, we conclude that when a prospective government employment relationship is negotiated at arm's length between sophisticated business persons who do not have a professional, fiduciary, or other special legal relationship, the prospective employee is not entitled to protection against negligent misrepresentations by the representative for the prospective government employer. We therefore reverse.

In March 2007 Smith became the head coach of the University's men's basketball team. Shortly after he was hired, Smith considered a number of individuals as po-

tential candidates for assistant coaching positions, including Williams. Williams had extensive coaching experience at a number of collegiate institutions, including as an assistant coach at the University from 1971 until 1986. During Williams' tenure with the University, the National Collegiate Athletic Association (NCAA) twice investigated the men's basketball program, found that Williams (among others) personally committed multiple violations of NCAA rules, and twice imposed penalties on that program. In the years since he left the University, Williams has not been found to have violated any NCAA rules and has obtained coaching positions with other teams. When the University hired Smith in March 2007, Williams was in the second year of a 3–year assistant coaching contract with Oklahoma State University (OSU), earning an annual salary of $158,000. He reported to Sean Sutton, who is the head men's basketball coach at OSU.

On March 30, 2007, Williams and Smith, who were both at the NCAA Final Four basketball tournament in Atlanta, Georgia, had a two-hour meeting to discuss the University, the role Williams could play as an assistant on Smith's staff, and possible compensation for such a position. Williams believed that Smith already knew about the NCAA violations, and Smith acknowledged that the disciplinary history of Williams may have been mentioned at that meeting.

Williams and Smith spoke on April 1, 2007, again discussing the possibility of Williams becoming an assistant coach at the University. Smith asked Williams to fax his resume to the University's basketball office, and Williams did so the next day.

On April 2, 2007, Smith spoke with University Athletic Director Joel Maturi. Smith told Maturi that he wanted to hire Williams and two other individuals as his assistant coaches. Smith and Maturi discussed concerns raised by Senior Associate Athletic Director Regina Sullivan regarding Williams, but Smith reassured Maturi about Williams. Following this conversation, Maturi directed others at the University to work on "temporary housing, transportation, University paperwork, keys, [and] ID" for Williams and the other potential new assistant coaches. In response to Maturi's direction, the University prepared, but did not finalize, a Memorandum of Agreement between the University and Williams.

Later that same day, Smith called Williams and told him the University would pay the salary Williams had requested. Smith asked Williams if he was "ready to join him at the University of Minnesota," and Williams replied, "[Y]es." Williams believed that Smith had offered him a job and that he had accepted. They also discussed the upcoming collegiate recruiting period, scheduled to begin that weekend. Smith wanted Williams to travel to Arkansas or Texas to recruit for the University. Williams told Smith that he had a recruiting trip scheduled with OSU head coach Sean Sutton on April 5, and if Williams was going to join Smith's staff, he needed to call Sutton that night. Williams testified that Smith offered to call Sutton, but Williams believed that he should do so.

Williams spoke with Sutton on the evening of April 2, 2007, told him that Smith had offered him a job at the University, that he had accepted Smith's offer, and that he would resign from OSU. Sutton asked Williams to submit a resignation letter the next day. Williams also called his real estate agent that night and told her to put his house on the market.

The next day, April 3, 2007, Williams went to OSU to prepare and submit his resignation letter. Before Williams sub-

mitted his resignation letter, Smith called Williams to tell him that Maturi's approval was needed for the offer to Williams.

Later that same day, Smith told Williams that Maturi strongly opposed hiring Williams because Maturi had learned for the first time that Williams had multiple major NCAA rules infractions when he was previously with the University. Given the University's history of NCAA rules violations in the men's basketball program, Maturi was concerned about maintaining a clean program and the potential media reaction if Williams returned. Smith also expressed concern about his own reputation and indicated that he did not want to get off on the wrong foot with his athletic director. Sutton received Williams' resignation letter on the afternoon of April 3, 2007. That same day, Sutton made arrangements to hire a new assistant basketball coach to replace Williams. By April 8, 2007, Williams knew that the University did not consider him to be one of its assistant basketball coaches. On May 29, 2007, the University notified Williams that the position of assistant men's basketball coach had been filled. Williams was unable to find another coaching position for the 2007–08 basketball season.

Subsequently, Williams sued the Board of Regents of the University of Minnesota and Maturi, asserting common law breach of contract, negligent misrepresentation, and estoppel claims (among others), and constitutional claims under 42 U.S.C. § 1983. The University moved to dismiss the common law claims, arguing that the district court lacked subject-matter jurisdiction over those claims because the issuance of a writ of certiorari is the only method by which a party can challenge the University's employment decisions. The University also sought dismissal of the claims under 42 U.S.C. § 1983 for failure to state a claim upon which relief could be granted. In March 2008 the district court granted the motions and dismissed all of the claims. Williams appealed.

The court of appeals affirmed the district court's dismissal of the common law, estoppel, and section 1983 claims, but reversed as to the negligent misrepresentation claim. *Williams v. Bd. of Regents of Univ. of Minn. (Williams I),* 763 N.W.2d 646, 651–55 (Minn.App.2009). The court of appeals held that the negligent misrepresentation claim was not "premised on an equitable or legal claim to employment," and because different considerations were at issue with that claim, judicial review would "not intrude substantially on or challenge the university's internal decision-making process." *Id.* at 652. The court of appeals remanded to the district court for trial solely on the negligent misrepresentation claim. *Id.* at 655.

Williams then commenced a separate action against Smith, asserting claims for fraud, negligent misrepresentation, interference with contract, and promissory estoppel, and the district court consolidated the two cases. Before trial, the district court granted Smith's motion to dismiss the contract and promissory estoppel claims and dismissed Maturi as a party to the litigation. The case then proceeded to trial on the negligent misrepresentation claims against the University and Smith, and the fraud claim against Smith. During the trial, Williams dismissed his fraud claim against Smith. The jury found for Williams and awarded damages.

After post-trial motions were resolved, the University and Smith appealed. Together, they challenged the denial of their motion for judgment as a matter of law; the denial of their motion for a new trial based on alleged evidentiary errors; the district court's subject-matter jurisdiction over Williams' negligent misrepresentation claim as presented at trial; and the dis-

trict court's failure to grant a greater remittitur. Williams cross-appealed from the district court's remittitur decision.[1]

The court of appeals affirmed. *Williams v. Smith (Williams II)*, Nos. A10–1802, A11–0567, 2011 WL 4905629 (Minn.App. Oct. 17, 2011). In doing so, the court of appeals concluded that Smith owed Williams a duty of care "during the hiring negotiations." *Id.* at *5. Additionally, the court of appeals held that because the University was engaged in a proprietary enterprise—collegiate sports—the rule that persons contracting with a government representative are conclusively presumed to know the extent of the representative's contracting authority was not applicable. *Id.* at *5–6. Finally, the court concluded that the evidence supported the jury's finding that Williams reasonably relied on Smith's misrepresentations regarding his authority to hire; rejected the University's argument that a new trial was required to address evidentiary errors; and held that the court had subject-matter jurisdiction over Williams' negligent misrepresentation claim. *Id.* at *6–8.

The University then sought review by our court. We granted the University's petition for review on the following issues: (1) whether a duty of care exists in arm's-length negotiations between a prospective employer and a prospective employee; and (2) whether a person negotiating a contract with a government representative is conclusively presumed to know the extent of the authority of that representative. The University also challenged the district court's subject-matter jurisdiction over Williams' negligent misrepresentation claim.

## I.

■ We first address the question of the district court's subject-matter jurisdiction over Williams' negligent misrepresentation claim. The University challenged jurisdiction at several points in this litigation. The court of appeals held that Williams' negligent misrepresentation claim did not "directly implicate[ ]" the University's "internal decision-making process" because the focus at trial would be on Smith's representations, Williams' reliance, and Williams' damages as a result of that reliance. *Williams I*, 763 N.W.2d at 652–53; *see also Williams II*, Nos. A10–1802, A11–0567, 2011 WL 4905629 at *8. The University argues, however, that before our court Williams depicts his case in standard contract terms—offer, acceptance, and repudiation of a job opportunity—and as such, this negligent misrepresentation case is a contract-based challenge to the University's decision not to hire him. This contract claim, the University argues, can be reviewed only by a writ of certiorari, which was not sought, and thus subject-matter jurisdiction is lacking.

■ When a party challenges the subject-matter jurisdiction of the court, the court must examine whether it has the authority to hear the type of dispute and

---

1. The jury awarded damages in the amount of $1,247,293. On post-trial motions, the district court reduced that award to $1,000,000 pursuant to Minn.Stat. § 3.736, subd. 4(e) (2010), because Smith was acting within the scope of his employment at the time he made the misrepresentations. On appeal, the University argued that a greater reduction should have been granted because Williams failed to mitigate his damages, any misrepresentations were not the proximate cause of his damages, or the damages awarded were the result of Williams' improper flaming of jury passion in closing arguments. Williams argued that Minn.Stat. § 3.736 was inapplicable, and therefore the full award should be restored. The court of appeals rejected all of these arguments. *Williams v. Smith*, Nos. A10–1802, A11–0567, 2011 WL 4905629, at *8–9 (Minn.App. Oct. 17, 2011).

to grant the type of relief sought. *Seehus v. Bor–Son Constr., Inc.,* 783 N.W.2d 144, 147 (Minn.2010). Without subject-matter jurisdiction, we must dismiss the claim. *See Tischer v. Hous. & Redev. Auth. of Cambridge,* 693 N.W.2d 426, 427 (Minn. 2005) (holding district court erred in failing to dismiss termination claim for lack of subject-matter jurisdiction). Defects "in subject-matter jurisdiction may be raised at any time" and cannot be waived. *Seehus,* 783 N.W.2d at 147. The existence of subject-matter jurisdiction is a question of law that we review de novo. *Tischer,* 693 N.W.2d at 428.

Previously, we have observed that the University of Minnesota is a "unique constitutional corporation, established by territorial act in 1853 and perpetuated by the state constitution in 1857." *Winberg v. Univ. of Minn.,* 499 N.W.2d 799, 801 (Minn.1993). The people of Minnesota conferred control and management of the University's affairs and property on the board of regents. *Id.* The Board of Regents of the University "is a unique entity, being both a constitutional corporation and an agency of the state." *Miller v. Chou,* 257 N.W.2d 277, 278 (Minn.1977).

▮▮▮ As with any state agency, judicial review of the University's administrative and quasi-judicial decisions is both limited and deferential, and under separation of powers principles, the exclusive method of review is by certiorari pursuant to Minn. Stat. § 606.01 (2010).[2] *See Dead Lake Ass'n v. Otter Tail Cnty.,* 695 N.W.2d 129, 134 (Minn.2005) (explaining that this court has "developed a body of case law treating the writ of certiorari as an extraordinary remedy that allows appellate review" of quasi-judicial decisions); *In re Haymes,* 444 N.W.2d 257, 259 (Minn.1989) ("Where no right of discretionary review has been provided by statute or appellate rules for the quasi-judicial decision of an administrative agency," an aggrieved party can petition for a writ of certiorari). The limited nature of certiorari review ensures that such decisions are "granted deference by the judiciary to avoid usurpation of the executive body's administrative prerogatives." *Tischer,* 693 N.W.2d at 429; *see also Dietz v. Dodge Cnty.,* 487 N.W.2d 237, 239 (Minn.1992) ("Because it mandates nonintrusive and expedient judicial review, certiorari is compatible with the maintenance of fundamental separation of power principles, and thus is a particularly appropriate method of limiting and coordinating judicial review of the quasi-judicial decisions of executive bodies.") (footnote omitted).

▮▮▮ But judicial deference to the University's administrative, quasi-judicial decisions is not absolute. Indeed, we will not hesitate to sustain a certiorari challenge to a decision of the University that is based on an error of law, or that is arbitrary, oppressive, unreasonable, or without evidence to support it. *See Dietz,* 487 N.W.2d at 239 (citation omitted). We have also stated that a state agency must engage in reasoned decision-making, and the agency must affirmatively state legally sufficient reasons for its decisions that are factually supported in the record. *See Dokmo v. Indep. Sch. Dist. No. 11, Anoka–Hennepin,* 459 N.W.2d 671, 675 (Minn. 1990). If it fails to do so, it runs the risk that its decision will not be upheld by the court, and a certiorari challenge will be sustained.

---

2. Minn.Stat. § 606.01 (2010) provides:
   No writ of certiorari shall be issued, to correct any proceeding, unless such writ shall be issued within 60 days after the party applying for such writ shall have received due notice of the proceeding sought to be reviewed thereby. The party shall apply to the Court of Appeals for the writ.

We conclude that the University's decision not to hire Williams is a quasi-judicial decision subject to certiorari review. Williams, however, asserts a claim for negligent misrepresentation against Smith. In *Willis v. County of Sherburne*, we held that the district court had subject-matter jurisdiction over a defamation claim brought against a government agency because the alleged defamation "occurred over a period of time which began more than a year before he was discharged and was separate and distinct from the termination of his employment." 555 N.W.2d 277, 282 (Minn.1996). The defamation claim was based on allegations that factually inaccurate statements by the government employer were disseminated publicly. *Id.* at 279. We stated that the district court's "necessary inquiry into what the [employer] knew about the truth or falsity of those [statements] before publishing them to a third party [did] not involve any inquiry into the [employer's] discretionary decision to terminate Willis," and thus certiorari was not required. *Id.* at 282–83; *see also Clark v. Indep. Sch. Dist. No. 834,* 553 N.W.2d 443, 446 (Minn.App.1996) (holding that a district court had jurisdiction over an employee's tort claims that did not "challenge his suspension or seek his reinstatement as relief," and that would require the court to "apply tort law, not [ ] scrutinize the school district's administrative decisions").

We conclude that a tort claim, such as for negligent misrepresentation, that is "separate and distinct" from the government agency's employment decision and does not involve any inquiry into the agency's "discretionary decision" is not subject to certiorari review. Our conclusion is simply an extension of our reasoning in *Willis*, in which we recognized that the inquiry into the basis for a defamation claim was separate and distinct from the inquiry required for a termination decision.

Here, the central issues decided by the jury were (a) whether Smith misrepresented the extent of his hiring authority, (b) whether Williams reasonably relied on that representation, and (c) whether Williams was damaged as a result. Unlike a challenge to a quasi-judicial hiring decision, Williams' negligent misrepresentation claim did not challenge the "propriety" of the University's discretionary decision not to hire him. Williams' claim thus was separate and distinct from the University's decision not to hire him because the central inquiry and focus was on Smith's representations.

The University argues, however, that review by certiorari should be required because Williams merely cloaks a contract dispute in the mantle of negligent misrepresentation. *See Willis*, 555 N.W.2d at 282 ("Regardless that the claim is cloaked in the mantle of breach of contract," a termination claim is reviewed by certiorari). This argument ignores the line that was drawn at trial between the University's actions, for which no jury decision was required, and Smith's representations, for which the jury's decisions were sought. The jury's focus was continually directed to Smith's representations and Willliams' reliance on those representations. In contrast, the jury was not asked to decide whether the University's decision not to hire Williams was a legally permissible exercise of the University's discretionary authority.

We recognize that evidence relating to the University's hiring practices generally and decisions with respect to Williams specifically was presented at trial. For example, Athletic Director Maturi testified about his experience with collegiate athletic hiring practices, negotiations, and hiring authority. Williams testified about his previous job searches and called former and current coaches to testify about hiring

practices in the collegiate basketball coaching industry. There was also extensive testimony about Williams' NCAA disciplinary history and the University's knowledge or exploration of that history during the Smith–Williams discussions.

But the introduction of this evidence did not transform Williams' negligent misrepresentation claim against *Smith* into a breach of contract claim for failure to hire against the *University*. Much, if not all, of this evidence was relevant to the reasonableness of Williams' reliance on Smith's misrepresentations. Some of it was also relevant to Williams' damages claim. Further, the district court ensured that the jury did not evaluate the evidence as a challenge to the University's decision not to hire by instructing the jury that the University's decision not to hire Williams was not at issue and that its focus was on the negligent misrepresentation claim. Finally, the special verdict form, in a detailed eight-question format, asked the jury to decide whether Smith "falsely represent[ed] that he had final authority to hire" at the University, whether Williams reasonably relied on that representation, and whether Williams was harmed in doing so. Nothing in the special verdict form allowed the jury to decide anything about the University's decision not to hire Williams. We assume that the jury follows a court's instructions. *State v. Ferguson*, 581 N.W.2d 824, 833 (Minn.1998); *see also State v. Forcier*, 420 N.W.2d 884, 885 n. 1 (Minn.1988). We have no reason to assume otherwise here.

In summary, we conclude that Williams' negligent misrepresentation claim is not subject to certiorari review under Minn. Stat. ch. 606 (2010) because it is separate and distinct from the University's decision not to hire him. Moreover, the jury was appropriately instructed to consider only the issues related to Smith's alleged negligent misrepresentations, and to limit its consideration to that claim. We therefore conclude that the district court had subject-matter jurisdiction over Williams' negligent misrepresentation claim.

## II.

Having concluded that the district court had subject-matter jurisdiction to address Williams' negligent misrepresentation claim, we now consider whether the University owed Williams a duty of care to protect him against negligent misrepresentations, and whether the claimed reliance is reasonable when a person negotiating with a government representative is conclusively presumed to know the authority of that representative.

■ This court has adopted the definition of negligent misrepresentation set forth in Restatement (Second) Torts § 552 (1976):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See Bonhiver v. Graff*, 311 Minn. 111, 122, 248 N.W.2d 291, 298 (1976) (adopting Restatement (Second) of Torts § 552 (Tent. Draft No. 12 (1966))). To prevail on a negligent misrepresentation claim, the plaintiff must establish: (1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information. *See id.* at 122, 248 N.W.2d at 299;

*Florenzano v. Olson,* 387 N.W.2d 168, 174 (Minn.1986). At issue here are the first and third elements, the duty of care and justifiable reliance. We address each issue in turn.

### A.

■ The University argues that an employer owes no duty to a prospective employee in the context of negotiations for an employment opportunity and therefore Williams' negligent misrepresentation claim fails as a matter of law. Williams, on the other hand, contends that Smith owed him a duty of care because liability for misrepresentations can arise even during an arm's-length negotiation, and because once Smith chose to speak, he had a duty not to mislead Williams after Williams' and Smith's interests were "unified."

■ We believe that the manner in which appellants treated Williams regarding his prospective employment with the University was unfair and disappointing. We do not condone their conduct. But the question we must decide is whether appellants owed Williams a duty of care and, therefore, whether appellants' conduct is actionable. The question of whether a duty of care exists in a particular relationship is a question of law, which this court determines de novo. *Domagala v. Rolland,* 805 N.W.2d 14, 22 (Minn.2011); *Foss v. Kincade,* 766 N.W.2d 317, 320 (Minn. 2009). Moreover, the existence of a duty of care is a threshold requirement. *Domagala,* 805 N.W.2d at 22. Without it, liability cannot attach. *Id.*

Previously, we have recognized a duty of care exists, for a negligent misrepresentation claim, in the context of certain legal relationships. For example, we have recognized a duty exists in professional relationships such as an accountant/client and attorney/client, and in certain fiduciary re-

lationships involving, for example, guardians, executors, and directors of corporations. *See Florenzano,* 387 N.W.2d at 174–75 .(noting that the word "duty" is commonly reserved for obligations of performance which rest upon a person in an official or fiduciary capacity and includes such offices or relations as those of attorney, guardian, executor or broker, a director of a corporation and a public official); *Bonhiver,* 311 Minn. at 122, 248 N.W.2d at 298–99 (concluding liability could be imposed on accountants who were aware of audited entity's impaired condition and knew that examiners' relied on accountants' work papers). Additionally, we have extended the duty to certain special legal relationships in which one party has superior knowledge or expertise. *See M.H. v. Caritas Family Servs.,* 488 N.W.2d 282, 288 (Minn.1992) (concluding that adoption agency with superior factual knowledge regarding health and genetic history of a child's birth parents owed a duty to adoptive parents who sought information on that history); *see also Florenzano,* 387 N.W.2d at 175 (recognizing that insurance agent and "would-be financial advisor" owed duty of care).

■ Thus, if a duty exists in a given case, it is derived from the legal relationship between the parties and a determination that the plaintiff's interests are entitled to legal protection against defendant's conduct. *See Caritas Family Servs.,* 488 N.W.2d at 287; *see also L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 378 (Minn.1989) ("An analysis of whether or not a duty of care is owed to a particular plaintiff begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. If [a duty is owed], it is because the law recognizes that public policy favors the protection of that person's interests against the [defendant's] negli-

gent conduct.") (citation omitted) (internal quotation omitted). Nonetheless, we have declined to adopt a negligent misrepresentation claim "in all contexts." *Smith v. Brutger Cos.*, 569 N.W.2d 408, 414 n. 4 (Minn.1997). We have instead recognized that "conduct actionable against one class of defendant[s] is not automatically actionable against another class of defendants." *Caritas Family Servs.*, 488 N.W.2d at 287. This limited scope of negligent misrepresentation rests in part on the principle that "[t]ort liability in the first instance always depends on whether the party accused of the tort owes a duty to the accusing party." *Id.* (*citing L & H Airco, Inc.*, 446 N.W.2d at 378).

In *Caritas*, the adoptive parents asserted that once the agency undertook to disclose that incest existed in the child's background, it assumed a duty of care that its disclosure be complete and unambiguous to ensure that the parents were not misled. 488 N.W.2d at 288. We observed that no duty is owed "unless the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Id.* at 287. We held that a duty of care existed when the adoption agency disclosed some information about the child's birth parents and genetic background, and negligently withheld information in such a way that the parents were misled. *Id.* at 288. Significant to our analysis of the duty owed was that the adoptive parents asked the agency about the child's background, and the agency's response withheld factual information that rendered its response misleading. *Id.* at 285–88.

Recently, we declined to decide whether a negligent misrepresentation claim can be brought by a party to an arm's-length commercial transaction. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 370 n. 7 (Minn.2009).[3] Other state courts that have considered this issue have not extended the duty of care to an arm's-length commercial transaction. *See, e.g., Fry v. Mount*, 554 N.W.2d 263, 266 (Iowa 1996) (concluding that where relationship was " 'adversarial' in nature, not advisory," no duty of care was owed); *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 843 P.2d 890, 897 (1992) (recognizing a distinction between a professional who owes duty of care when "acting to further the economic interests of" the person owed the duty of care, while no duty owed where "two adversarial parties [are] negotiating at arm's length to further their own economic interests."). The underlying reasoning is that sophisticated parties negotiating a commercial transaction are entitled to legal protection only for intentional, fraudulent misconduct. *See* Restatement (Second) of Torts § 552, cmt. a (recognizing a "more restricted rule of liability" for negligent misrepresentation because a significant difference exists between "the obligations of honesty and of care" and stating "it does not follow that every user of

3. We note that the court of appeals has declined to recognize such a claim in the context of private, sophisticated parties negotiating a commercial transaction at arm's length. *See Smith v. Woodwind Homes, Inc.*, 605 N.W.2d 418, 424–25 (Minn.App.2000) (declining to recognize a duty of care in a transaction negotiated by adversarial parties at arm's length, where both parties were "experienced at closing real-estate transactions and [the closing company] has not demonstrated any special relationship between them indicating they were anything other than sophisticated equals negotiating a business transaction."); *Safeco Ins. Co. of Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 872 (Minn.App.1995) ("Because Dain was selling a deal to Safeco, and not supplying information for the guidance of Safeco, and because they were sophisticated equals negotiating a commercial transaction, Dain did not owe Safeco a duty for purposes of a negligent misrepresentation tort threshold").

commercial information may hold every maker to a duty of care.").

Nor have we recognized a duty of care in the context of prospective government transactions. Indeed, we have required parties who challenge erroneous government action as "wrongful" to show something more than "simple inadvertence, mistake, or imperfect conduct" by the defendant government agency. *See City of N. Oaks v. Sarpal,* 797 N.W.2d 18, 25 (Minn.2011) (citation omitted).

Applying these principles, we consider whether public policy favors protecting a prospective government employee from the negligence of a government representative. To do so, we consider the nature of the relationship between Williams and Smith. *See, e.g., Florenzano,* 387 N.W.2d at 175 (explaining that defendant was liable for representations made as an "insurance agent and would-be financial advisor," but the same representations made by a "stranger" or "neighbor" would be "nothing more than gratuitous advice"); *L & H Airco, Inc.,* 446 N.W.2d at 378 ("If an attorney owes a duty to his client's adversary, it is because the law recognizes that public policy favors the protection of that person's interests against the attorney's negligent conduct.").

We conclude that the legal relationship between Williams and Smith is not the type of relationship entitled to legal protection, and therefore no duty of care against negligent misrepresentation is owed. Three reasons support our conclusion. First, their relationship in negotiating potential employment was not a professional, fiduciary, or special legal relationship in which one party had superior knowledge or expertise. *Florenzano,* 387 N.W.2d at 175 (imposing duty where insurance agent "and would-be financial advisor" provided information on financial advantages of withdrawing social security

benefits, without "knowing [whether it was] true or false," but noting that the "same representations, if made by a stranger off the street or the next-door neighbor, would be nothing more than gratuitous advice"); *Caritas Family Servs.,* 488 N.W.2d at 287 (recognizing "the compelling need of adoptive parents for full disclosure of ... information that may be known to the agency"). In short, Williams and Smith did not stand in a professional or fiduciary relationship to each other during the negotiations over prospective employment with the University, nor was Smith acting in an advisor capacity to Williams. *See Bogue v. Better–Bilt Aluminum Co.,* 179 Ariz. 22, 875 P.2d 1327, 1339 (Ariz.Ct.App. 1994) ("Although an employer has a special relationship with an employee, the same cannot be said about the employer's relationship with a job applicant."), *rev. denied* (Ariz. July 6, 1994); *Conway v. Pac. Univ.,* 129 Or.App. 307, 879 P.2d 201, 203 (1994) ("Whatever duty an employer may owe to an employee in other contexts of the employment relationship, we know of no duty of an employer to act to further the economic interests of the employee in the negotiation of the employment contract."), *aff'd,* 324 Or. 231, 924 P.2d 818 (1996).

Moreover, Smith did not have the type of superior knowledge or expertise typically indicative of a special legal relationship. Instead, the parties stood on equal footing regarding the scope of Smith's authority in negotiating a prospective employment relationship. The scope of Smith's authority was equally available to both parties. A review of the University's publicly accessible web site, which is a matter of public record, readily demonstrates that Maturi had the authority to hire the assistant men's basketball coach, and that Smith did not. *See Delegations of Authority Pro-*

gram, http://compliance.umn.edu/ delegationHome.htm (last visited Aug. 6, 2012). Nothing in this publicly available information indicates that Smith held delegated authority to hire assistant basketball coaches. In addition, Smith notified Williams that Maturi had to sign off on Smith's offer before Williams submitted his resignation to OSU, and there was no evidence that Smith told Williams that Smith had final hiring authority. Thus, even assuming there was a legal relationship that would support a duty of care, any knowledge Smith had was not superior to Williams' knowledge—Smith's knowledge (Maturi's hiring authority) was shared with Williams. *See also Sarpal,* 797 N.W.2d at 26 ("The court made no finding that the [government] employee intended to deceive the Sarpals or induce them to build their shed in violation of the zoning ordinance.")

Second, the nature of the relationship between Williams and Smith does not support recognizing a duty of care in this case. The relationship between Williams and Smith in their discussions of Williams' prospective employment as an assistant basketball coach was that of two sophisticated business people, both watching out for their individual interests while negotiating at arm's length. Both coaches had decades of coaching experience at a variety of institutions, with a variety of hiring practices, a variety of athletic directors, and a variety of employment conditions. Williams had successfully negotiated coaching contracts with several elite institutions, both public and private, including the University, OSU, The University of Tulsa, San Diego State University, the University of Nebraska, the University of Louisiana—Lafayette, and the Minnesota Timberwolves. Williams' contract with OSU was in writing. Smith and Williams were, by their own admissions, experienced participants in the collegiate basketball coaching environment, including the hiring practices within that environment.

Third, we perceive no reason or public policy that warrants imposing a duty of care in the context of a prospective government employment relationship involving negotiations by sophisticated parties who do not stand in a special legal relationship. The weight of authority from other jurisdictions refuses to recognize a claim for negligent misrepresentation in such circumstances. *See, e.g., McNierney v. McGraw–Hill, Inc.,* 919 F.Supp. 853, 862 (D.Md.1995) ("It is by no means certain that [the duty of care] would be imposed" in at-will employment negotiations); *Fry,* 554 N.W.2d at 266 ("The record before us plainly reveals that [the employee] and [employer] were dealing at arm's length. The relationship was 'adversarial' in nature, not advisory."); *American Med. Int'l, Inc. v. Giurintano,* 821 S.W.2d 331, 340 (Tex.App.1991) ("It would be fanciful at best to suggest that every time one applies for a job with a potential employer that a fiduciary relationship is created. When a person enters into job negotiations he is looking out for himself while the potential employer is looking out for the needs of the business.").

We conclude that Williams' interests in prospective employment with the University's men's basketball program are not entitled to legal protection against Smith's negligent misrepresentations.[4]

---

4. The dissent inaccurately states that we hold the University has no obligation to "supply accurate and truthful information to a prospective employee." In doing so, the dissent misstates our holding. Specifically, we hold that when a prospective employment relationship is negotiated at arm's length between two sophisticated parties, the prospective employee is not entitled to legal protection against negligent misrepresentation by the

The dissent relies on *Northernaire Productions, Inc. v. County of Crow Wing,* 309 Minn. 386, 244 N.W.2d 279 (1976), and *Mulroy v. Wright,* 185 Minn. 84, 240 N.W. 116 (1931), to argue that we have previously recognized the tort of negligent misrepresentation against the government. The argument is without merit for two reasons. First, the holding in *Northernaire* was that county officials were not liable when "they negligently misrepresent the *legal* requirements of their zoning ordinance to members of the public who rely on that misrepresentation." 309 Minn. at 387, 244 N.W.2d at 281 (emphasis added). The holding in *Northernaire* is of little help to Williams, since it essentially stands for the unremarkable proposition that city officials are generally not liable for misrepresentations of law. In addition, *Northernaire* and *Mulroy* did not recognize a cause of action for negligent misrepresentation in an arm's-length negotiation between sophisticated parties regarding prospective employment. In *Northernaire,* the claim failed because misrepresentations of law are not actionable in the absence of either special knowledge or a fiduciary relationship—the two critical components missing in that case, and missing here as well. *See* 309 Minn. at 389, 244 N.W.2d at 281–82 (explaining that misrepresentations of law are actionable if defendant is "learned in the field [of law] and has taken advantage of the solicited confidence" of the plaintiff, or if "the person misrepresenting the law stands ... in a fiduciary or other similar relation of trust and confidence.") (citation omitted).

It is true, as the dissent suggests, that we observed in *Northernaire* that we "will continue to allow a cause of action against government officers and employees for negligent misrepresentation of fact" *id.* at 390, 244 N.W.2d at 283, but we relied on *Mulroy* for that proposition. *Id.* at 388, 244 N.W.2d at 281. *Mulroy* dealt with a city clerk's erroneous assessment certification; in *Mulroy,* the defendant was held liable "not merely for careless words," but for "the careless performance of a service" owed by the government official. 185 Minn. at 88, 240 N.W. at 117 (quoting *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 276 (1922)). *Mulroy* is particularly weak support for the claims here because the government official in *Mulroy* had a public duty as custodian of the city's records to furnish accurate information about the assessments shown in those records. *Id.* at 86–87, 240 N.W. at 117. Smith, in contrast, holds no duty to the public. *See* Restatement (Second) of Torts § 552, cmt. k (acknowledging that government officials who have, "by acceptance of [the] office, ... undertaken a duty to the public to furnish information of a particular kind," can be held liable to "the class of persons for whose benefit the duty is created"). Further, there was no evidence here, and the dissent points to none, that

---

representative for the prospective government employer. But a prospective employee like Williams does have a potential claim for intentional, fraudulent misrepresentations. *See Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.,* 736 N.W.2d 313, 318 (Minn.2007) (identifying elements of fraud claim). Thus, even if a plaintiff cannot establish that a defendant owed a duty of care, the plaintiff may bring a claim for fraudulent misrepresentation if the element of "fraudulent intent" can be established. In this case, nothing in the record suggests that Smith's statements were made

with fraudulent intent, which Williams most likely realized when he voluntarily dismissed his fraud claim prior to the jury's deliberations. Thus, while our holding today bars negligent misrepresentation claims based on prospective government employment negotiated at arm's length between two sophisticated parties, it does not bar actions for intentional, fraudulent misrepresentations. The dissent's assertion that we hold that the University has no obligation to supply "truthful information to a prospective employee" is therefore incorrect.

supports a conclusion that either Smith or the University assumed a duty to furnish the public with particular information regarding the hiring authority of Smith, Maturi, or anyone else at the University. Consequently, *Northernaire* and *Mulroy* do not directly support the claims of Williams and both are factually distinguishable.

Second, our recent cases have carefully limited recognition of the tort of negligent misrepresentation, against both private actors and government officials. Recently, in *Valspar Refinish, Inc. v. Gaylord's, Inc.*, we declined to decide whether a negligent misrepresentation claim can be brought by a party to an arm's-length commercial transaction. 764 N.W.2d 359, 370 n. 7 (Minn.2009). In *City of North Oaks v. Sarpal*, we held that neither erroneous government action nor "a simple mistake by a government official" is wrongful government conduct. 797 N.W.2d 18, 25–26 (Minn.2011). These recent decisions are consistent with earlier decisions in which we have rejected an expansive view of both negligent misrepresentation and government liability. *See Smith*, 569 N.W.2d at 414 n. 4 (declining to adopt negligent misrepresentation "in all contexts"); *see also Mesaba Aviation Div. of Halvorson of Duluth, Inc. v. Cnty. of Itasca*, 258 N.W.2d 877, 880 (Minn.1977) (noting that the court does "not envision that estoppel will be freely applied against the government").

Alternatively, Williams relies on *Caritas* to argue that when Smith spoke to Williams, he had a duty not to mislead Williams. But this argument is flawed. Specifically, this argument conflates the question of whether Smith owed a duty of care to Williams based upon a legal relationship, with the question of whether Smith supplied false information to Williams. *See* Restatement (Second) of Torts, § 552. The duty of care examines the legal relationship between the parties, not the nature of the representations, and in the absence of a duty, there can be no breach. *See Domagala*, 805 N.W.2d at 22–23.[5]

Additionally, the holding in *Caritas* is narrow. In *Caritas*, we held that once the adoption agency undertook to disclose some genetic information to the adoptive parents, it had a duty "to not mislead [the parents] by only partially disclosing the truth." 488 N.W.2d at 288. We specifically declined, however, to impose that duty in the context of all adoptions. *Id.* at 287. The facts in *Caritas* demonstrated that the adoptive parents had inquired over time about the adopted child's family background and genetic history, and the adoption agency had responded with increasingly detailed facts. *Id.* at 285–86. As we pointed out, the adoptive parents did not allege that the agency insufficiently investigated the child's family and genetic background or had an "affirmative common law duty to disclose facts" beyond those re-

---

5. The dissent contends that we "mischaracterize[ ]" the adoptive parents' inquiries in *Caritas*. These inquiries were relevant because liability for negligent misrepresentation "depends in the first analysis on whether a duty of care is owed," *L & H Airco, Inc.*, 446 N.W.2d at 378, and no duty is owed "unless the plaintiffs' interests are entitled to legal protection against a defendant's conduct." *Caritas*, 488 N.W.2d at 287. Thus, the adoption agency's superior knowledge, coupled with its misleading disclosures of that knowl-

edge, led to protection of the adoptive parents' interests. *See id.* at 288 (recognizing that imposing a duty on adoption agency would benefit adoptive parents because "adoption agencies are the adoptive parents' only source of information about the child's medical and genetic background"). We have not recognized a duty of care in the absence of either superior knowledge or a special relationship, particularly in the context of sophisticated parties who are experienced at negotiating the transaction at issue.

quired by statute or administrative rule. *Id.* at 287. Instead, the duty of care arose in *Caritas* because the agency "undertook to disclose the information," and therefore "assumed a duty to use due care that its disclosure be complete and adequate." *Id.* We nevertheless recognized that "under other circumstances the policy concerns of the adoption agencies may preclude a cause of action." *Id.* at 287.[6]

Unlike the situation in *Caritas*, Williams never asked whether Smith had the authority to hire; he simply assumed that authority existed. We have never held that the plaintiff's mistaken assumption can impose a duty, particularly in the context of sophisticated parties negotiating at arm's length.

We have not previously recognized the tort of negligent misrepresentation in the context of government employment relationships and we decline to do so here. In summary, we conclude that Smith did not owe Williams a duty of care in these negotiations. We therefore hold that in the absence of a duty of care, Williams' claim for negligent misrepresentation fails as a matter of law.

### B.

Our conclusion that no duty of care was owed makes it unnecessary to address the issue of Williams' reliance.

We conclude that we also need not resolve the scope of the decision relied on by the University, *Jewell Belting Co. v. Village of Bertha*, to argue that Williams' reliance was unreasonable. 91 Minn. 9, 12, 97 N.W. 424, 425 (1903). Specifically, we have rejected the use of the proprietary-

governmental conduct dichotomy to determine the manner of judicial review of municipal decision-making. *Cnty. of Washington v. City of Oak Park Heights*, 818 N.W.2d 533, 545–46 (Minn.2012). We reject the proprietary-governmental conduct dichotomy in this context as well.

Reversed.

GILDEA, C.J., PAGE, PAUL H. ANDERSON, and STRAS, JJ., took no part in the consideration or decision of this case.

Concurring in part, dissenting in part, MEYER, J. and SENYK, Acting Justice
Took no part, GILDEA, C.J., PAGE, PAUL H. ANDERSON, and STRAS, JJ., TOMLJANOVICH, ESTHER and SENYK, WALDEMAR, Acting Justices.[7]

MEYER, Justice (concurring in part, dissenting in part).

I agree with the majority that the district court had subject-matter jurisdiction to resolve the negligent misrepresentation claim of James Williams against the University of Minnesota, but I respectfully dissent from the majority's conclusion that public policy does not support imposing a duty of care on the University to supply accurate and truthful information to a prospective employee. The majority ignores our case law that expressly recognizes a cause of action against the government for negligent misrepresentations of fact when there is no other access to the information. Therefore, consistent with our precedent, I would affirm the jury verdict on the negligent misrepresentation claim.

6. Moreover, we fail to see how Smith's disclosure could have misled Williams into believing that Smith had final hiring authority when Smith told Williams the opposite—that Maturi had that authority. *See Domagala*, 805 N.W.2d at 22 ("[W]e have continued to recog-

nize that generally in law, we are not our brother's keeper.") (citation omitted) (internal quotation marks omitted).

7. Appointed pursuant to Minn. Const. art. VI, § 2, and Minn. Stat. § 2.724, subd. 2 (2010).

The existence of a legal duty is a question of law based on public policy concerns. *Smith v. Brutger Cos.*, 569 N.W.2d 408, 415 (Minn.1997) (Tomljanovich, J., dissenting); *M.H. v. Caritas Fam. Servs.*, 488 N.W.2d 282, 287 (Minn.1992). The majority erroneously states that we have never recognized a duty of care in the context of prospective government transactions.[1] We first recognized a cause of action against the government for negligent misrepresentation of fact in *Mulroy v. Wright*, 185 Minn. 84, 88, 240 N.W. 116, 117–18 (1931), where we held that government employees have a duty of care in supplying accurate factual information on which they know that others will rely. In *Mulroy*, we concluded that a government official who furnished a certificate that inaccurately showed there were no special assessments on certain property—"knowing and intending that someone else rely thereon"—owed "a duty imposed by law" to the buyer of the property who relied upon the certificate. *Id.* at 88, 240 N.W. at 118. We imposed a duty on the government official as a matter of law because the law imposes a duty "when one assumes to act and knows that others will act in reliance upon such conduct." *Id.* at 86, 240 N.W. at 117. As we explained, where the government official "was in a position to know the truth," he had a duty to provide accurate factual information so that persons who relied on that information would "not suffer loss through improper performance of the duty or neglect in its execution." *Id.* at 86–87, 240 N.W. at 117.

We have since reaffirmed that "[w]e will continue to allow a cause of action against government officers and employees for negligent misrepresentation of fact." *Northernaire Prods., Inc. v. Cnty. of Crow*

*Wing*, 309 Minn. 386, 390, 244 N.W.2d 279, 282 (1976). We explained the public policy rationale as follows:

> Members of the public have no other access to factual information maintained by the government except through government officers and employees. Therefore, the policy of promoting accuracy through the prospect of tort liability outweighs the possibility of inhibiting performance of duties of office or employment.

*Id.* at 390, 244 N.W.2d at 282. We have distinguished negligent misrepresentations of law, concluding that subjecting public officials to liability for "innocent misrepresentations" regarding the interpretation of a zoning ordinance—a matter of law— "would frustrate dialogue which is indispensable to the ongoing operation of government" and noted that the public "had alternative means of obtaining an interpretation of the zoning ordinance." *Id.* at 388–90, 244 N.W.2d at 281–82.

In this case, Smith, as a University employee, assumed to act on behalf of the University and knew that Williams would act in reliance upon his job offer. Williams presented evidence that the University's head men's basketball coach Tubby Smith offered him the job of assistant men's basketball coach. Smith told Williams that he "got the money" they had discussed: $175,000 from the Athletics Department and $25,000 from basketball camps. Smith knew that the job offer was subject to the approval of the University's Athletic Director, but falsely represented that Smith had final hiring authority, knowing and intending that Williams would rely on Smith's representation to

---

1. The majority indicates that parties who challenge government action must show "wrongful" conduct. *City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 25 (Minn.2011). This is the standard that applies in the context of equitable estoppel claims against the government and has no application to a negligent misrepresentation claim. *See id.*

resign from his current position. At Smith's urging, Williams immediately re-signed from his position at Oklahoma State University (OSU) so that he could begin recruiting for Minnesota. Several weeks later, after Williams had given up his job at OSU, the University informed Williams that the assistant coaching position at Minnesota had been filled. Based on this evidence, the jury found that Smith falsely represented that he had final authority to hire assistant basketball coaches at Minnesota, a negligent misrepresentation of fact.

There is no evidence in the record that Williams had access to any publicly available information regarding the authority to hire within the men's basketball program.[2] In fact, the jury specifically found that Williams reasonably relied on Smith's representation that he had final hiring authority and that Williams was not negligent in relying on Smith's representation. Notwithstanding the jury's findings and our obligation to view the evidence "in the light most favorable to the verdict," *Reedon of Faribault, Inc. v. Fid. & Guar. Ins. Underwriters, Inc.*, 418 N.W.2d 488, 491 (Minn.1988), the majority claims that "the parties stood on equal footing regarding the scope of Smith's [hiring] authority." The majority's view of the evidence is not consistent with the jury's finding that Smith failed to use reasonable care in communicating his authority to Williams, that

Williams reasonably relied on Smith's representation that he had final hiring authority and that Williams was not negligent in doing so. The evidence at trial demonstrates that Smith was well aware of the limits of his own hiring authority while Williams had no means of ascertaining the accuracy of Smith's representation. The majority asserts, without record support, that information about Smith's hiring authority was available on the University's website. There is nothing in the trial record indicating that information about hiring authority within the men's basketball program was accessible to the public when Smith offered Williams the job in 2007—just a few weeks after Smith became the head basketball coach—or that Williams was aware of the availability of that information. Significantly, the University asserts only that the exclusive authority of the Athletic Director to hire assistant coaches "was commonly known within the University's athletic department."

On these facts, I would conclude that the government official (Smith) owed a duty of care to provide accurate information to the public (Williams). The government official's duty should be imposed as a matter of law by this court. Recognizing a duty of care in this case would serve the public policy of promoting accuracy when a government official knows that others will act

2. The University relies on our 1903 decision in *Jewell Belting Co. v. Village of Bertha*, 91 Minn. 9, 12, 97 N.W. 424, 425 (1903), for the proposition that a person contracting with a municipal corporation is "conclusively presumed to know the extent of authority possessed by the officers with whom they are dealing." *Jewell Belting* is distinguishable. *Jewell Belting* was an action to recover under a contract, not a negligent misrepresentation case. *See id.* at 10, 97 N.W. at 424. Further, the narrow issue we decided in *Jewell Belting* related to the legal power of a village council to delegate authority to enter into a contract; the presumption of knowledge concerned the power of the village council to delegate authority—a legal question, not a fact question. *See id.* at 10–11, 97 N.W. at 424–25 (concluding that village council did not have power to delegate authority to enter into contract for fire engine, which involved the exercise of judgment and discretion); *cf. Miller v. Osterlund*, 154 Minn. 495, 496, 191 N.W. 919, 919 (1923) (explaining that "the law is presumed to be equally within the knowledge of both parties"). In this case, the University is not arguing that the Board of Regents did not have the power to delegate hiring authority to the head basketball coach.

in reliance on the official's representations of fact, and would be consistent with this court's precedent. *See Northernaire,* 309 Minn. at 390, 244 N.W.2d at 282.

The majority further observes that Smith and Williams were both "sophisticated business people" and "experienced participants in the collegiate basketball coaching environment," thereby suggesting that Williams should have realized that Smith did not have final hiring authority. Williams testified, however, that in all his years of coaching, he did not know of a single head basketball coach who did not possess the authority to hire his own staff. Other experienced coaches similarly testified that they had never heard of a university administrator vetoing the hiring decision of a head coach. The majority also questions how Smith "could have misled Williams into believing that Smith had final hiring authority" when Smith told Williams that the Athletic Director had that authority, but this disclosure took place only after Williams had orally resigned from his position at OSU and the head coach had acted to fill that position. Therefore, in describing the nature of the relationship between Williams and Smith, the majority has unfairly skewed the evidence to support its result, contrary to our standard of review.

In addition, the majority erroneously suggests that a duty did not arise under these circumstances, in part because "Williams never asked whether Smith had the authority to hire." The majority attempts to distinguish the duty we recognized in *M.H. v. Caritas Family Services,* 488 N.W.2d 282, 287 (Minn.1992), on the basis that the adoptive parents in *Caritas* "had inquired over time about the adopted child's family background and genetic history." The majority mischaracterizes *Caritas* by implying that the duty in that case arose from the inquiries of the adoptive parents. The adoptive parents in *Caritas* did not make any specific inquiries about the incest in the child's background before they adopted the child. *See* 488 N.W.2d at 284–85. Nonetheless, we explained that the adoption agency "had a legal duty to not mislead plaintiffs by only partially disclosing the truth." *Id.* at 288. In other words, "having undertaken to disclose information about the child's genetic parents and medical background," the adoption agency could not "negligently withhold[ ] information in such a way that the adoptive parents were misled as to the truth." *Id.* We recognized "the compelling need" of the adoptive parents for accurate medical background information where the adoption agency was their "only source of information." *Id.* at 287–88. Williams makes a similar argument here—that "because once Smith chose to speak, he had a duty not to mislead Williams"—but the majority rejects this argument as conflating "the question of whether Smith owed a duty" with "the question of whether Smith supplied false information."

Like the duty we recognized in *Caritas,* a duty to not negligently misrepresent factual information in the possession of the University does not impose an "extraordinary or onerous burden" on the University. 488 N.W.2d at 288. Smith knew the limits of his hiring authority and simply had a duty not to falsely represent the scope of his hiring authority when he knew that Williams would rely on that authority to resign from his position at OSU. On the other hand, the failure to use due care had enormous consequences for Williams, who suffered losses exceeding $1 million in reasonably relying on Smith's false representation that he had final authority to hire assistant coaches. Imposing a duty of care on the University to provide truthful and accurate information to a prospective employee aligns with our established "policy of promoting accuracy through the

prospect of tort liability" where the public has "no other access to factual information maintained by the government." *Northernaire*, 309 Minn. at 390, 244 N.W.2d at 282. Therefore, I would affirm the jury verdict and uphold our precedent holding that the government has a duty to use due care in supplying factual information that is not otherwise accessible to the public.

SENYK, Acting Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice MEYER.